### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **AURA CAPITAL LIMITED,** | **CIVIL ACTION NO. _____** |
| **Plaintiff,** | |
| **vs.** | **(INDIVIDUAL) COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| **PETROLEO BRASILEIRO S.A. (PETROBRAS), MARIA DAS GRACAS SILVA FOSTER, ALMIR GUILHERME BARBASSA , JOSÉ ANTONIO DE FIGUEIREDO, JOSÉ MIRANDA FORMIGLI FILHO, JOSÉ CARLOS COSENZA, JOSÉ ALCIDES SANTORO MARTINS, JOSÉ EDUARDO DE BARROS DUTRA,  and SERGIO MACHADO** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

SUMMARY & OVERVIEW OF THE ACTION .......................................................1

CAUSATION AND ECONOMIC LOSS ...............................................................10

JURISDICTION AND VENUE .............................................................................13

PARTIES ..............................................................................................................14

    Plaintiff ..........................................................................................................14

    Corporate Defendant ....................................................................................15

    Individual Defendants ...................................................................................15

STRUCTURE OF THE COMPANY AND THE EXECUTIVE DIRECTORATE....................18

BACKGROUND TO THE FRAUDULENT SCHEME .............................................23

SUBSTANTIVE ALLEGATIONS .........................................................................33

    Defendants' Materially False and Misleading Statements & Omissions Made
        Available During the Relevant Period ................................................33

    Defendants' Materially False and Misleading Statements & Omissions Made
        During the Relevant Period................................................................43

THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF PETROBRAS
    BEGINS TO BE DISCLOSED............................................................................61

    Partial Revelation I: "Reckless" Omissions Lead to Billions in Cost Overruns...............65

    Partial Revelation II: The Company Confirms The Existence of Corruption ..................66

    Partial Revelation III: Additional New Details are Revealed by Police
        Investigations and the Company........................................................69

    Partial Revelation IV: Additional Arrests, Evidence of Senior Management
        Involvement, and Delay of Petrobras Financial Reporting....................71

VIOLATIONS OF GAAP, SEC & IFRS REPORTING RULES .................................74

    Reporting Standards for PP&E under IFRS: .................................................75

    Reporting Standards for PP&E under U.S. GAAP........................................77

ADDITIONAL SCIENTER ALLEGATIONS ............................................................................83

ADDITIONAL DEVELOPMENTS CONFIRM THE FRAUD ..................................................110

ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' ACTIONABLE
     STATEMENTS AND OMISSIONS OF OPINION.........................................................125

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
     DOCTRINE ...................................................................................................................127

NO SAFE HARBOR ...............................................................................................................128

BASIS OF ALLEGATIONS ...................................................................................................128

FIRST CLAIM........................................................................................................................129

SECOND CLAIM....................................................................................................................130

THIRD CLAIM ......................................................................................................................133

## INTRODUCTION

1.      This is a federal securities action on behalf of **Aura Capital Limited** ("Aura Capital" or "Plaintiff") related to its purchases, through its assignors, of the American Depository Shares ("ADSs") of Petróleo Brasileiro S.A. ("Petrobras" or the "Company"), during the period between **March 7, 2014 and December 15, 2014,** inclusive (the "Relevant Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, Defendants published a series of materially false and misleading statements and omissions that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal information necessary to make Defendants' statements, in light of such omissions, not materially false and misleading. As a result, Plaintiff purchased ADSs of the Company at inflated prices and was damaged thereby when the truth was revealed, removing the artificial inflation from the price of the ADSs. Defendants also engaged in a scheme in violation of § 10(b)5 (a) and (c) of the Exchange Act, which damaged Plaintiff, as discussed herein.

## SUMMARY & OVERVIEW OF THE ACTION

2.      Petrobras is one of the largest integrated oil and gas companies in the world and one of the most valuable companies in Brazil. Petrobras' ADSs trade on the New York Stock Exchange and represent approximately 80% of the average daily trading volume for its securities worldwide. The Brazilian federal government is the controlling shareholder of the Company and owns over 50% of its common shares.

3.      The Company engages in the production, exploration, refining and marketing of petroleum. Petrobras generates over $100 billion[1] per year in revenues, and regularly contracts for multi-billion dollar construction projects. The Company also purchases billions of dollars of facilities, equipment and other assets used in its operations. By the inception of the Relevant Period, Petrobras reported approximately $228 billion of Property, Plant & Equipment assets on its balance sheet.

4.      In order to drive up the value of their securities, Petrobras issued numerous statements, both prior to, and during the Relevant Period, attesting to, among other things: the Company's transparency; the Company's effective controls and procedures; the value of the Company's PPE assets; the Company's compliance with accounting and financial reporting standards and regulations; the reliability of the Company's projections; and the Company's lack of involvement in any illegal or fraudulent business practices. Defendants also made actionable omissions prior to and during the Relevant Period.

5.      As Plaintiff has now learned, however, prior to and throughout the Relevant Period, Defendants engaged in a scheme and illegal course of conduct whereby contractors paid bribes to executives at Petrobras in exchange for construction contracts. These contracts were then over-inflated by Petrobras by as much as 20% so that the contractors could afford to pay a kickback fee up to 3%. The over-inflated contracts were then capitalized and reported as assets on the Company's balance sheet. These kickbacks were then given to high level politicians to assure the continued flow of contracts to Petrobras and its construction cartel (the "Cartel"), and to entrench high-level Petrobras executives in their lucrative positions at the Company.

---

[1] All References to "$" are to U.S. Dollars unless otherwise noted.

6.     The full impact of this massive fraud on Petrobras' financial statements is still under investigation, but after months of delay during which the Company failed to report its financial results,  on April 22, 2015, the Company reported a massive charge – which included a $16.8 billion write-down, including $14.7 billion on impaired assets and  $2.1 billion in losses relating to the kickback scheme since 2004.

7.     In addition to finally disclosing the Company's true and accurate financial condition and results for 3Q:14, this massive write-off demonstrates that Petrobras' financial statements published during the Relevant Period were not true, accurate or reliable, or prepared in compliance with general or international accepted accounting principles or standards. Under no accounting convention is it permissible to generate kickbacks by using over-inflated construction contracts and then to capitalize such costs by recording the illegal bribes and contract over-payments as costs associated with asset acquisitions, and then booking these costs as property, plant & equipment assets on Petrobras' balance sheet.

8.     Despite its magnitude and longevity, the bribery and bid-rigging scheme at Petrobras was only recently uncovered, after Brazilian police who were investigating money laundering and drug dealing involving an unrelated network of gas stations and car washes, inadvertently stumbled upon the massive Petrobras fraud. Named Operation Carwash, or *Lava Jato*, this Brazilian government investigation ultimately exposed a major criminal network that embezzled billions of dollars and involved leading politicians and public servants, the chief executives of large multi-national contractors, middlemen, money handlers **and Petrobras**. Federal prosecutors in Brazil estimated that this long-running criminal scheme operated for 15 years. Estimates place the amount embezzled from Petrobras at $3.8 billion.

9.     Petrobras' criminal scheme is already now considered **the biggest corruption scandal in the history of Brazil.** The *Lava Jato* investigation, however, uncovered Petrobras' massive fraud scheme, following the arrest and conviction of Alberto Youssef ("Youssef"), who was found guilty of money-laundering through a massive corruption network. In connection with his March 2014 arrest, the federal police found a list of 750 construction and public works projects that were identified as part of the scheme. The arrest of Youssef quickly led to the subsequent arrest of a former Director of Petrobras' Supply Unit, Paulo Roberto Costa ("Costa"), who was incarcerated three days after Youssef's conviction. According to Brazilian authorities, Youssef was the "financial agent" while Costa was the "political operator."

10.    According to Brazilian police and prosecutors, it has now been determined that Petrobras obtained contracts through embezzlement and bribery of very high ranking government officials then distributed these state contracts among contracting and engineering firms that were part of a cartel. The money was then further passed on to different political parties through a laundering scheme - - primarily to the *Partido dos Trabalhadores* ("PT" or "Workers Party") of Brazilian President Dilma Rousseff – the former CEO of Petrobras who served as CEO during much of the time that the scheme operated. As of May 15, 2015, the Brazilian Supreme Court had authorized the investigation of 48 current and former legislators and Brazilian prosecutors charged four former members of congress with money laundering, embezzlement and other crimes. Federal prosecutor Deltan Dellagnol has publicly stated that more public officials will be charged.

11.    At least twenty large construction firms have so far been implicated in this scheme, including: Odebrecht, Odebrecht Óleo e Gás, Odebrecht Ambiental, Camargo Corrêa, Promon Engenharia, Andrade Gutierrez, Iesa, Fidens Engenharia, SOG Óleo e Gás, Engevix,

4

Mendes Júnior, UTC Engenharia, Sanko Sider, Queiroz Galvão, and Galvão Engenharia. In addition, Petrobras was accused of engaging in the kick-back scheme with SBM Offshore NV. Currently, at least 85 warrants have been issued and several companies have already agreed to cooperate and to surrender hundreds of millions of dollars to the Brazilian authorities in penalties and fines. At least four former Petrobras executives and at least 23 construction executives already have been charged with crimes such as corruption and money laundering.

12.     As evidence of Defendants' scienter and to cover up the billions of dollars in misappropriated funds, Petrobras capitalized the bribes and material over-payments on contracts, and reported them as costs related to the construction of oil and gas infrastructure or as acquired assets, both of which were reported as wildly inflated PP&E the Company's balance sheet. After being capitalized, these costs also were later recognized as *expenses* for the depreciation of these related "assets" and were then calculated in Petrobras' reported *net income*.

13.     Despite this material accounting fraud, throughout the Relevant Period Defendants repeatedly stated that Petrobras accounted for construction projects and asset acquisitions in accordance with generally accepted accounting principles ("GAAP") and/or International Financial Reporting Standards ("IFRS"). According to both GAAP and IFRS, however, Petrobras was required to report its assets at values equal to the reported costs incurred in their construction or acquisition – excluding any bribery or cost inflation associated with the kick-back scheme. GAAP and IFRS mandate that the costs that may be capitalized for an asset constructed under contract, include *only* the costs that relate directly to the specific contract, costs attributable to and allocated to that contract, and other costs that are specifically attributable to a customer under that contract. With regard to acquired assets such as property,

plant and equipment, as well as construction and other expenditures, GAAP and IFRS mandate that these assets be measured at their true costs.

14.     The representations concerning the Company's asset values, expenses, net income and contingent liabilities as well as Defendants' statements concerning Petrobras' financial condition and GAAP or IFRS compliance were patently untrue throughout the Relevant Period. During this time, Defendants knew or recklessly disregarded the true impact that Petrobras' long-running, multi-billion dollar bribery and bid-rigging scheme was having on the Company's reported financial statements and balance sheet.

15.     Defendants' statements that purported to attest to Petrobras' controls and procedures – specifically including anti-corruption policies – and its officers' and directors' stated ethical duties and obligations were also materially false and misleading. At all times, Plaintiff relied upon the statements and representations contained in the Conduct Guide, Code of Ethics and its Corruption Prevention Manual, and relied upon Defendants' representations that these standards and principles were being adhered to and enforced within Petrobras.

16.     Based upon the purported high ethical and procedural standards reported by Petrobras, it was impossible to conclude that a multi-billion dollar bribery, bid-rigging and accounting fraud scheme had been ongoing within the Company for over fifteen years. The Company issued these statements prior to and during the Relevant Period to inflate the value of their securities, and make the Company's securities more attractive to investors who might otherwise have avoided the Company. Once the securities were artificially inflated, Defendants also issued bonds worth over $8.5 billion in the public market, thereby further profiting from the scheme.  As Plaintiff ultimately learned, these representations made in connection with that bond

offering were also materially false and misleading and were known by Defendants to be false, or were recklessly disregarded as such.

17.     The statements made by Defendants publicly and/or published in the Company's press releases and SEC filings were also each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such. In particular, at all times during the Relevant Period, as Defendants knew and/or failed to disclose, the truth about Petrobras included the following:

- Billions of dollars in project over-payments and bribes were reported on Petrobras' balance sheet as assets – including Property Plant & Equipment – which had the effect of artificially inflating asset values, while under-reporting costs and liabilities.

- Costs associated with bribe-related expenses to contractors were capitalized as artificial inflation of asset values, which were then recorded on Petrobras' balance sheet. The result of the artificial inflation of assets was the creation of materially false and misleading financial statements, which relied upon the inflated asset values.

- As a result of the foregoing, throughout the Relevant Period it also was not true that the Company's financial statements and reports were prepared in accordance with IFRS, GAAP or SEC rules.

- At a time when Defendants caused or allowed Petrobras to engage in a massive bribery, bid-rigging and accounting fraud scheme, Defendants were not abiding by principles stated in the Company's Code of Ethics or Conduct Guide, or the standards of conduct specified in Petrobras' Corruption Prevention Manual.

- At a time when Defendants caused or allowed Petrobras to engage in a massive bribery, bid-rigging and accounting fraud scheme, Defendants lacked any reasonable basis to claim that they maintained adequate systems of financial and operational controls.

18.     The truth about Petrobras began to be revealed beginning in mid-October 2014, when a series of reports resulting from the *Lava Jato* investigation reached the market. Those "corrective disclosures" included in part, the following:

- 10/15/14 - The Administrative Council for Economic Defense, a Brazilian anti-corruption agency, announced that it is opening a formal investigation into overbidding and bribery among construction companies and Petrobras.

- 10/27/14 - Petrobras tacitly admitted that some unspecified amount of bribery and overpayments had occurred. The Company announces that it hired outside counsel to seek reimbursement of any "deviated resources" and amounts lost through over-payments to construction cartel members.

- 11/17/14 - Brazilian police arrested 18 more individuals, including Renato Duque, former Director of Engineering and Services at Petrobras. Dozens of warrants were served and large multi-national construction firms were raided – charged with colluding to inflate costs for projects with Petrobras.

- 12/12/14 to 12/15/14 – On Friday, December 12, 2014, charges were filed against 35 people in Brazil. Bribes estimated to total more than **$4 billion**. Report that Petrobras was informed of rampant corruption, bribery and bid-rigging in 2009. After the markets were closed, Petrobras announced that the 3Q:14 results were indefinitely delayed. The following Monday, December 15, 2014, Brazilian authorities announce the arrest of Nestor Cervero, the former director of Petrobras' international division, and provided additional details on the bribery and fraud that took place at Petrobras.

19.   These belated disclosures caused a massive decline on extraordinarily high volume in the price of Petrobras securities and eviscerated over $8.5 billion in the Company's market capitalization as evidenced by the following chart:



20.     Defendants were motivated to and did conceal the true operational and financial condition of Petrobras and materially misrepresented and failed to disclose the conditions that were adversely affecting the Company throughout the Relevant Period. Defendants' scheme: (i) deceived Plaintiff regarding Petrobras' asset value and book value, its business and operations, management credibility and the intrinsic value of Petrobras ADSs; (ii) enabled Defendants to artificially inflate the price of Petrobras securities; (iii) enabled Defendants to sell at least $8.5 billion of Petrobras corporate debt securities while in possession of material adverse non-public information about the Company during the Relevant Period; (iv) caused Plaintiff to purchase Petrobras ADSs at artificially-inflated prices; and (v) harmed Plaintiff when the truth was revealed causing the artificial inflation to be removed from the price of the ADSs, and the price of these securities to plummet.

## CAUSATION AND ECONOMIC LOSS

21.     During the Relevant Period, Defendants engaged in a scheme to deceive Plaintiff and other investors, and a course of conduct that artificially inflated Petrobras' ADS prices during the Relevant Period, by misrepresenting the Company's asset values, balance sheet and contingent liabilities, among other financial metrics. Over a period of approximately nine months, Defendants improperly inflated Petrobras' balance sheet by what appears to be hundreds of millions and possibly billions of dollars in over-inflated construction contracts and paid bribes. Ultimately, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to Plaintiff and other investors, Petrobras ADSs declined precipitously – evidence that the prior artificial inflation in the price of Petrobras' shares was eradicated. As a result of its purchases of Petrobras ADS during the Relevant Period, Plaintiff suffered economic losses, *i.e.* damages under the federal securities laws.

22.     By improperly capitalizing bribes and construction contract over-payments, designed to support a long-running kickback, bribery and accounting fraud scheme, and then reporting those payments on the Company's balance sheet as inflated Property Plant & Equipment, Defendants presented a misleading image of Petrobras' business and operations. During the Relevant Period, Defendants repeatedly emphasized their ability to monitor and control Petrobras' internal operations, and consistently reported financial results and results of operations filed with the SEC, which Defendants signed and certified were prepared in conformity with generally accepted accounting principles in the U.S. and International Accounting Standards abroad. These claims caused and maintained the artificial inflation in Petrobras ADS prices throughout the Relevant Period and until the truth about the Company was ultimately revealed to investors.

10

23.     Defendants' materially false and misleading statements and omissions had the intended effect of causing Petrobras' ADSs to trade at artificially inflated levels throughout the Relevant Period. During the Relevant Period Petrobras ADSs reached a trading period high of over $20.90 per share on September 3, 2014.

24.     Beginning on October 15, 2014, however, shares of the Company began to collapse as partial revelations were revealed to the public. Investors slowly learned the truth about the Company as facts related to the *Lava Jato* investigation began to enter the market. It was only then that Plaintiff first began to learn that Defendants had failed to report the Company's financial and operational results in accordance with either international or generally accepted accounting principles. Defendants' belated disclosures had an immediate, adverse impact on the price of Petrobras shares – causing the shares to drop in value from $17.10 on October 14, 2014 to $15.55 on October 15, 2014, an over 9% price drop in heavy trading. By the time the truth was fully revealed, Petrobras ADSs fell to as low as $6.26 by December 15, 2014.

25.     These belated revelations regarding Petrobras' multi-billion bribery, bid-rigging and accounting fraud scheme also evidenced Defendants' prior falsification of the Company's reported financial results and asset values. As Plaintiff and the market ultimately learned, the Company's prior financial results had been overstated, as were its reported Property, Plant & Equipment assets. As this adverse information became known, the prior artificial inflation began to be eliminated from Petrobras ADS prices, and Plaintiff was damaged as a result of the related share price decline.

26.     As a direct result of the market learning the truth about the Company, as facts discovered in the *Lava Jato* investigation became known world-wide, from mid-October to mid-December 2014, the price of Petrobras ADSs collapsed. This dramatic decline in the price of

Petrobras ADSs eradicated much of the artificial inflation from Petrobras' share price, causing real economic loss to Plaintiff who purchased its shares during the Relevant Period.  During that time, as a result of reports reaching the market on 10/27/14, 11/17/14 and 12/12/14-12/15/14, almost $100 billion of Petrobras' market capitalization was eradicated. In the process, Defendants also compromised Petrobras' ability to borrow money or sell debt or equity.

27.     The decline in Petrobras' share prices on October 15, 2014, October 27, 2014, November 17, 2014 and December 12-15, 2014 were direct results of the nature and extent of Defendants' fraud being uncovered. The timing and magnitude of Petrobras' ADS price decline negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct. During the same period in which Petrobras ADS prices fell over 60% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index increased by almost 7.75%.

28.     The economic loss, *i.e.* damages suffered by Plaintiff, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Petrobras ADSs, and the subsequent significant decline in the value of Petrobras ADSs when Defendants' prior misstatements and other fraudulent conduct was revealed.  The dramatic declines in the price of the Company's ADSs immediately following each of Defendants' three belated disclosures are evidenced, in part, by the chart below:



## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Petrobras maintains assets within the United States and its securities trade on the New York Stock Exchange, and many of the acts and practices complained of herein occurred in substantial part in this District. In addition, Petrobras maintains an office in this District at 570 Lexington Ave, 43rd Floor, New York, NY 10022.

32.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(d), because Petrobras is a foreign or "alien" corporation that does significant business in this District, and may properly be sued in any District of the United States, including the Southern District of New York. Moreover, because Aura Capital is an entity formed under the laws of Hong Kong, there is complete diversity among and between the parties to this action.

33.     Petrobras is not immune from suit in the United States under the Foreign Sovereign Immunities Act ("FSIA") as Petrobras engages in commercial activity in the United States and elsewhere, having a direct effect on the United States. *See* FSIA, Title 28, U.S.C. §§ 1330, 1332, 1391 (f) and 1441(d).

34.     Petrobras also has minimum contacts within New York to make the exercise of jurisdiction over the Company by the federal courts of New York consistent with traditional notions of fair play and substantial justice. Defendant Petrobras transacts business, has an agent and/or is found within New York, and the unlawful conduct alleged in this complaint had negative effects in New York.

35.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiff

36.     Plaintiff, **AURA CAPITA**, is an investment company formed in Hong Kong that has standing and authority to sue Defendants through a valid legal assignment, on behalf of Aura Capital's sole-owners, two related investors ("Assignors"), who purchased  Petrobras ADSs at artificially inflated prices during the Relevant Period and were damaged when the true facts were

revealed and the artificial inflation in the price of the ADSs was eviscerated.  All purchases of Petrobras ADS by the Assignors during the Relevant Period are set forth in Exhibit A attached hereto.

**Corporate Defendant**

37.    Defendant **PETROLEO BRASILEIRO S.A.** ("Petrobras") is a corporation organized under the laws of the nation of Brazil, which maintains its principal place of business at Avenida Republica do Chile, No. 65, 23rd Floor, Rio de Janeiro, Brazil, RJ 20031-912. According to the Company's financial reports filed with the SEC, Petrobras is dedicated, directly or through its subsidiaries, to prospecting, drilling, refining, processing, trading and transporting crude oil from producing onshore and offshore oil fields and from shale or other rocks, as well as oil products, natural gas and other liquid hydrocarbons. In addition, Petrobras carries out energy related activities, such as research, development, production, transport, distribution and trading of all forms of energy, as well as any other correlated or similar activities. Petrobras ADSs are listed on the NYSE under the symbol "PBR." Petrobras maintains offices at 570 Lexington Avenue, NY, NY 10022.

**Individual Defendants**

38.    Defendant **MARIA DAS GRACAS SILVA FOSTER** ("Foster") is, and during the Relevant Period was, Chief Executive Officer ("CEO") and Chief International Officer and a member of the Board of Directors of the Company. During the Relevant Period, Defendant Foster signed and/or certified the Company's SEC Filings, and signed the March 17, 2014 Registration Statement filed in connection with the sale of over $8.5 billion of corporate debt. Prior to the Relevant Period, Defendant Foster also served as Petrobras' Chief Gas and Power Officer, from September 2007 through January 2012, Defendant Foster has served as a member of the Board of Directors of the Company since February 2012.

15

39.     Defendant **ALMIR GUILHERME BARBASSA** ("Barbassa") is, and during the Relevant Period was, Chief Financial Officer ("CFO") and Investor Relations Officer of the Company. Prior to the Relevant Period, Barbassa served as CFO of Petrobras since 2005. During the Relevant Period, Defendant Barbassa signed and/or certified the Company's SEC Filings, and signed the Registration Statement filed with the SEC on or about March 17, 2014 in connection with the sale of over $8.5 billion of corporate debt.

40.     Defendant **JOSÉ ANTONIO DE FIGUEIREDO** ("Figueiredo") served as the Chief Engineering, Technology & Procurement Officer during the Relevant Period. Defendant Figueiredo engaged in and/or facilitated the bribery scheme throughout the Relevant Period.

41.     Defendant **JOSÉ MIRANDA FORMIGLI FILHO** ("Formigli") served as the Chief Exploration and Production Officer during the Relevant Period. Defendant Formigli engaged in and/or knew of or recklessly disregarded the bribery scheme throughout the Relevant Period.

42.     Defendant **JOSÉ CARLOS COSENZA** ("Cosenza") served as the Chief Downstream Officer during the Relevant Period. Defendant Cosenza engaged in and/or knew of or recklessly disregarded the bribery scheme throughout the Relevant Period.

43.     Defendant **JOSÉ ALCIDES SANTORO MARTINS** ("Martins") served as the Chief Gas and Power Officer during the Relevant Period. Defendant Martins engaged in and/or knew of or recklessly disregarded the bribery scheme throughout the Relevant Period.

44.     Defendant **JOSÉ EDUARDO DE BARROS DUTRA** ("Dutra") served as the Chief Corporate and Services Officer during the Relevant Period. Dutra engaged in and/or knew of or recklessly disregarded the bribery scheme throughout the Relevant Period.

45.     Defendant **SERGIO MACHADO** ("Machado") served as CEO and President of Petrobras' transport unit, Transpetro, from June 2003 to February 5, 2015. Defendant Machado engaged in and/or knew of or recklessly disregarded the bribery scheme throughout the Relevant Period.

46.     The Defendants referenced above in ¶¶ 38-45 are referred to herein as the "Individual Defendants."

47.     Defendants Foster and Barbassa, because of their positions with the Company, possessed the power and authority to control the contents of Petrobras' quarterly and year-end reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to Plaintiff or the public, Defendants Foster and Barbassa knew that the adverse facts specified herein had not been disclosed to and were being concealed and that the positive representations being made were then materially false and misleading. Defendants Foster and Barbassa are liable for the false and misleading statements pleaded herein.

48.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Plaintiff as a purchaser of Petrobras ADSs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived Plaintiff regarding Petrobras' asset value and book value, its business and operations, management credibility and the intrinsic value of Petrobras ADSs; (ii) enabled Defendants to artificially inflate the price of Petrobras securities; (iii) enabled

17

Defendants to sell at least $8.5 billion of Petrobras corporate debt securities while in possession of material adverse non-public information about the Company during the Relevant Period; (iv) caused Plaintiff , through its Assignors, to purchase Petrobras ADSs at artificially inflated prices; and (v) harmed Plaintiff when the truth was revealed and the artificial inflation was removed from the price of the ADSs.

### STRUCTURE OF THE COMPANY AND THE EXECUTIVE DIRECTORATE

49.     Petrobras is a Brazilian state-run oil company that was incorporated in 1954. Petrobras is the largest corporation in Brazil (and in the Southern Hemisphere) by market capitalization, and one of the largest integrated oil and gas conglomerates in the world. Petrobras also operates in 22 other countries, including in the United States, where the Company focuses on deepwater oil exploration in the Gulf of Mexico.

50.     During the Relevant Period, Petrobras' revenue was derived from five separate business segments:

- **Oil and Gas Exploration and Production** ("E&P" ): The E&P Division was responsible for Petrobras' "core activities" of oil and gas exploration, development, and production in Brazil. It is currently operating offshore drilling operations in the Campos Basin, and onshore operations in the Northern, Northeastern, and Southeast areas of Brazil.

- **Refining ("Downstream")**: The Refining Division focused on all of Petrobras' refining activities that took place in Brazil, which included 13 refineries, spread nationwide, and a shale processing unit. Costa was the Director of this Division until he departed in April 2012.

- **Gas and Power ("G&P")**: The G&P Division handled the distribution of Petrobras' gas and related activities including fertilizer production and electric power generation using natural gas and renewable energy sources. Under Foster, who was Director of the G&P Division, profit at Petrobras' G&P business more than doubled in the first nine months of 2011, before she was promoted to CEO in February 2012.

- **Distribution**: The Distribution Division was in charge of distributing Petrobras products throughout Brazil. Cerveró was CFO of this Division prior to being terminated in December 2014.

- **International**: The International Division focused on all of Petrobras' activities occurring internationally (or, outside of Brazil), including procurement, sales, exploration, and distribution on international projects and contracts. Cervero was formerly the director of the International Division.

51.    Petrobras' Services Division is responsible for handling all of the Company's construction and engineering contracts as well as carrying out tenders for the other operational divisions of the Company, including the Downstream/Supply, Gas & Energy, and Exploration & Production Divisions. The operational divisions of Petrobras "hired" the Services Division to implement and oversee the construction of the project. Duque was the Director of the Services Division from 2003 to 2012, and Barusco worked directly underneath Duque as Executive Manager of Engineering. Duque and Barusco were key players in the fraud and bribery that occurred at Petrobras.

52.    According to the Brazilian prosecutor's criminal complaint against the Company and related entities, the Company was organized as follows:



53.    The Company also operated several subsidiaries, including its fully owned subsidiary, Transpetro. Transpetro was established on June 12, 1998, by act of the Brazilian Legislature to restructure the oil sector in Brazil. Transpetro provides transportation and storage

activities of oil and oil byproducts. It is the largest oil and gas transportation company in Brazil. Machado served as CEO of Transpetro throughout the Relevant Period until he was forced to resign at the request of Petrobras' auditor, PWC.

54.     Pursuant to Brazilian law, the Brazilian federal government must own a majority of the voting stock of Petrobras and therefore, Petrobras' Board of Directors is controlled by the Brazilian Federal Government. Under the Company's bylaws, the board of directors elects the executive officers, including the CEO, CFO and members of the  Executive Directorate who control the day-to-day management of the Company. The Company's bylaws also provide that the board of directors may remove any executive officer from office at any time with or without cause.

55.     These bylaws have the effect of making Petrobras a vehicle for the policies of certain government officials. As stated in the Company's 2014 20-F

> As our controlling shareholder, the Brazilian federal government has pursued, and may pursue in the future, certain of its macroeconomic and social objectives through us, as permitted by law. Brazilian law requires that the Brazilian federal government own a majority of our voting stock, and so long as it does, the Brazilian federal government will have the power to elect a majority of the members of our board of directors and, through them, a majority of the executive officers who are responsible for our day-to-day management. **As a result, we may engage in activities that give preference to the objectives of the Brazilian federal government rather than to our own economic and business objectives**.

[Emphasis supplied].

56.     Among other responsibilities in the day-to-day management of Petrobras, the Company identified certain reporting and oversight responsibilities that fell upon the  Executive Directorate, including:

- Developing the Company's ethics program through the creation of the Petrobras Ethics Commission in 2008 which is responsible for promoting

corporate compliance with ethical principles, as well as acting as a forum for discussion of subjects related to ethics;

- Preparing and reviewing quarterly financial statements and submitting those reports to the board of directors for final approval; and

- Meeting at least twice weekly with the other members of the Executive Directorate to focus on the physical and financial monitoring of the principal projects in Petrobras' investment plan.

57.     Prior to and during the Relevant Period, the Petrobras' Executive Directorate included the CEO and six senior officers of the Company and heads of the Divisions of Finance, Gas and Energy, Downstream, Services, International, and Exploration and Production. During the Relevant Period, the Executive Directorate included: (1) Defendant Barbassa, the Chief Financial Officer; (2) Defendant Figueiredo, the Chief Engineering, Technology & Procurement Officer; (3) Defendant Formigli, the Chief Exploration and Production Officer; (4) Defendant Cosenza, the Chief Downstream Officer; (5) Defendant Martins, the Chief Gas and Power Officer; (6) Defendant Dutra, the Chief Corporate and Services Officer; and (7) Defendant Foster, the CEO. All of the following Directorate Executives were either key participants in or, at minimum, knew of or recklessly disregarded the bid-rigging scheme and its impact on Petrobras' financial statements.

58.     In part in an attempt to distance themselves from civil and/or criminal liability in connection with the massive fraud, the Executive Directorate resigned *en masse* following the revelations of the *Lava Jato* scandal, with all but Defendant Dutra having resigned in early 2015, and Defendant Dutra has taken a health-related leave of absence since February 27, 2015, effectively removing him from his responsibilities as an executive director at the Company.

59.     Defendant Foster was Chief Executive Officer and Chief International Officer as well as a member of the Board of Directors of Petrobras from February 2012 until her forced

resignation in February 2015. The fraud and inflation of construction contracts was brought to the attention of Foster prior to her appointment as CEO by at least two whistleblowers. Foster issued numerous statements during and prior to the Relevant Period attesting to a "zero tolerance" policy to fraud and corruption in the Company's activities and businesses. Foster is now under investigation by the Brazilian Prosecutors Office in the Federal District and the Public Prosecutor at the Federal Audit Court called for not testifying truthfully to the Brazilian Congress.

60.     Defendant Barbassa was Chief Financial Officer and Investor Relations Officer of the Company during the Relevant Period. Defendant Barbassa was also a key figure in participating in meetings and conference calls with investors and analysts, during which he provided details on the Company's financials and their anti-corruption policies.

## BACKGROUND TO THE FRAUDULENT SCHEME

61.     Throughout the Relevant Period, Defendants engaged in a scheme and illegal course of conduct whereby contactors paid bribes to executives at Petrobras in exchange for construction contracts. These contracts were then over-inflated by Petrobras by as much as 20% so that the contractors could afford to pay a kickback fee up to 3%. The over-inflated contracts were then capitalized and reported as assets on the Company's balance sheet. These kickbacks were then given to high level politicians to assure the continued flow of contracts to Petrobras and its construction cartel. The following key projects are significant examples of the long-running and widespread corruption at the Company.

62.     **The Pasadena, Texas Refinery.** In 2006, the Company became involved in the bidding for ownership and operation of the Pasadena Refinery.

23

63.     According to a January 14, 2015 article published by the <u>Wall Street Journal</u>,[2] regarding the ultimately price paid for the Pasadena Refinery:

> Petrobras paid about $1.25 billion for the Pasadena refinery, including substantial legal fees incurred when the deal went into arbitration in the U.S., after initially planning to buy only a 50% stake for $359 million. Brazilian prosecutors have said the refinery's previous owner-Belgian commodities trader Transcor Astra Group-bought it for only $42.5 million.

64.     <u>Business News Americas,</u> in an article published on April 15, 2014,[3] confirmed the figures above.  Petrobras' acquisition of the Pasadena Refinery for $1.2 billion (USD) represents over twenty-eight times the $42.5 million (USD) amount paid by its predecessor.

65.     The aforementioned <u>Business News Americas</u> article further reported that, defending the purchase during a senate hearing, Petrobras CEO Maria das Graças Foster "…admitted that the Pasadena refinery, despite operating at a profit during the first quarter of 2014, has led to losses of US$530mn for Petrobras."  Though she did not admit wrongdoing at the time, the article highlights Foster's acknowledgment that the Pasadena Refinery transaction was bad for the Company and its shareholders.  She stated: "Looking at those figures, it wasn't a good deal, it can't have been a good deal. That's unquestionable from an accounting point of view…"

66.     In reality, the Pasadena acquisition was beset by fraud and impropriety, as evidenced by the testimony of Costa.  On January 23, 2015, a report by the <u>The Rio Times</u>

---

[2]     The article was titled "Brazil Police Arrest Another Ex-Petrobras Executive; Arrest of Nestor Cerveró Is Part of Broader Corruption Investigation."

[3]     The article was aptly titled, "Pasadena Refinery A Bad Deal for Petrobras – CEO."

detailed Costa's testimony, including the amount that he personally received relative to the

Pasadena Refinery acquisition:[4]

> Costa has testified that he personally received a $1.5 million bribe and that
> Company officials received tens of millions of dollars in bribes from Astra
> relating to the Pasadena Refinery acquisition.

67.     As reported by *Bloomberg BusinessWeek* on October 20, 2014, Petrobras

provided little, if any, oversight of transactions relative to investment projects in general, and the

Pasadena Refinery in particular.   Further, at least one member of the Company committee

investigating the transaction, was removed from the committee:

> "During the two years I've been occupying the seat, no investment project has
> been individually assessed by the board. The board is excluded from the decision
> process, and it should be accountable for it," said Mauro Cunha, who has
> represented minority investors on the Petrobras 10-member board since 2013.

> Cunha was on a Petrobras committee investigating Pasadena and Abreu e Lima
> and was removed by the Petrobras board from that committee during an April 25
> meeting. Cunha has lodged a complaint with the country's securities and
> exchange commission, known as CVM, questioning his removal and the
> independence of the committee.

68.     On January 14, 2015, the *Wall Street Journal* reported that Nestor Cerveró, the

former director of Petrobras' international division, had been arrested in Rio de Janeiro.   The

article further reported:

> In March 2014, Mr. Cerveró was fired from his post as chief financial officer at
> Petrobras' fuel-distribution subsidiary. Mr. Cerveró also served Petrobras as head
> of its international division, from 2003 to 2008, when the company acquired a
> refinery in Pasadena, Texas, which public prosecutors say Petrobras paid too
> much for.

---

[4]     The Rio Times, "Ex-Petrobras Director Got US$1.5 Million For Pasadena Deal,"
published January 23, 2015.

Petrobras paid about $1.25 billion for the Pasadena refinery, including substantial legal fees incurred when the deal went into arbitration in the U.S., after initially planning to buy only a 50% stake for $359 million. Brazilian prosecutors have said the refinery's previous owner-Belgian commodities trader Transcor Astra Group-bought it for only $42.5 million.

Separately, in December, Brazilian federal prosecutors filed charges against Mr. Cerveró and three others in connection with $53 million in bribes allegedly paid by Samsung Heavy Industries as part of a deal to supply offshore drilling vessels. Samsung hasn't yet responded to requests for comment.

In testimony before Brazil's Congress at the end of last year, Mr. Cerveró denied ever having received bribes or knowing about alleged corruption.

69.    In the same article, the *Wall Street Journal* also reported that, "Mr. [Paulo Roberto] Costa, who struck a plea deal with investigators in return for a lesser sentence, is under house arrest in Rio de Janeiro."

70.    On May 26, 2015, the *Wall Street Journal* reported that Mr. Cerveró had been convicted and sentenced to five years in prison, and fined 543,000 reais.

71.    **The Urucu-Coari-Manaus gas pipeline.** The Urucu-Coari-Manaus gas pipeline was a major infrastructure project designed to transport natural gas to remote cities in the Brazilian Amazon rain forest that previously relied on more expensive diesel oil for energy. Planning and development of the project started in 2004 - 2006 and the first estimates for the project's costs, as calculated by Petrobras' engineering team, projected the pipeline to cost $1.2 billion reais.

72.    However, the Company's executive instead budgeted and eventually contracted the project for $2.4 billion reais. By the time the project was finalized, three years after schedule, the costs had ballooned to $4.5 billion reais as contract additions were included prior to any work being done.

73.     According to a report prepared by Barusco in connection with his plea bargain, 1% of the contract that was paid to the construction companies, including Andrade Gutierrez e Carioca, OAS, Camargo Correa e Skanska, and Etesco, was bribe money that was paid back to political parties and Petrobras executives. Mario Goes of the Rio Marines construction company acted as the payment agent for these bribes.

74.     According to an investigation by the TCU, there were numerous irregularities between the amounts budgeted for certain aspects of the project and the amounts that were ultimately contracted, including overcharging on the oil and gas maintenance and recovery system by over twice the estimated cost.

75.     Irregularities at the Urucu-Coari-Manaus gas pipeline were brought to the attention of company executives, including Defendant Foster, by Gesio Rangel de Andrade ("Rangel"), an engineer who worked as the general manager on the project. Rangel refused to approve various contracts due to inflated prices that he felt were unjustified. Rangel specifically complained to Company executives about the contracts approved by the Engineering Department, which was headed at the time by Renato Duque, who negotiated contracts with contractors. Duque has since been implicated as a key conspirator by the testimony of Costa, and has been indicted and arrested for his role in the fraud.

76.     Instead of investigating the over-charging documented by Rangel, the Company "put him in the freezer" in 2007, moving him to a new office, cutting his pay, and refusing to give him additional work to do.

77.     The testimony of Julio Camargo, a consultant for Toyo, and Augusto Ribeiro de Mendonca Neto, an executive of Setal, confirm the fraud that occurred on the Urucu Manaus project.  According to a January 14, 2015 article in *O Globo*, the two testified that the

construction companies were part of the Cartel that participated in the bribery-corruption scheme, and that they received and paid bribe money for their contracts on the Urucu-Manaus pipeline. According to the article, Camargo received 15 million reais in bribes, of which 2 million reais were paid back to Duque, using Barusco as a middle-man.

78. **The Abreu & Lima Refinery**. In 2005, Petrobras embarked on plans to build the Abreu & Lima Refinery in northeastern Brazil. Costa headed the project and was responsible for negotiating with contractors to work on the project The original budget for the project was $2.5 billion, but the project costs inflated exponentially, and it has been projected by recent estimates to cost up to $20 billion.

79. As costs of construction at the Abreu & Lima Refinery rose throughout the years leading up to the Relevant Period, investors, analysts and Brazilian politicians raised concerns regarding the escalating costs. Opposition parties spearheaded efforts to create a Parliamentary Investigative Committee to investigate possible corruption relating to the project.

80. According to the testimony of Costa, Petrobras was able to avoid any scandal through bribery, backdoor political maneuvering and negotiating. Petrobras, through Costa, reached out to Senator Sergio Guerra in the summer of 2009, and Guerra was eventually selected to direct the investigation, and they discussed how to make the investigation go away. After negotiations with Guerra, Costa got the "green light" from then-CEO Sergio Gabrielli to pay Guerra a bribe of $10 million reais (approximately US $4 million) to ensure that the investigation did not implicate Petrobras in any wrongdoing.

81. The Company also issued numerous statements to investors and analysts, attesting to the propriety of the construction of the Abreu & Lima facility. In an effort to refute any allegations or findings of malfeasance, the Company launched a new public relations campaign

28

in the form of a "Fact and Data" section on its website, where it could present information and arguments in response to any news revealed about the Company. For instance, Petrobras categorically denied any impropriety in a July 22, 2009 post, stating:  "There are no problems with Petrobras contracts. There is no overbilling. There are only some divergences between the technical criteria used by the company and the para-meters employed by the Federal Court of Auditors."

82.     As detailed below, Costa, Erton Medeiros Fonseca, Barusco and others have now confessed that Abreu served as a slush fund for hundreds of millions of dollars in kickbacks to Petrobras executives and Brazil's governing political parties.  According to Barusco, the Cartel negotiated in coordination with one another and with Petrobras for contracts to be "at prices at the top echelon of the Petrobras budget."

83.     **The Comperj Refinery**. The Petrochemical Complex of Rio de Janeiro ("Comperj") is a refinery in the state of Rio de Janeiro. Construction began in 2004 and it was originally expected to be operational by 2011 and to cost approximately $6.1 billion. By 2006, the expected cost rose to $8.4 billion, with an operation start date pushed back until 2012. The Company reports that, as of February 2015, the project is still only 83% done with an expected operational date of August 2016. It has reportedly already cost over $30 billion, more than 400% over the original budget.

84.     The Company repeatedly denied any impropriety or irregularities with the Comperj project, and insisted that there was no overpricing and that it had followed all company procedures to ensure competitive bidding.

85.     Now, as evidence of the *Lava Jato* scandal has become revealed, it has become clear that operations at the Comperj project were not conducted according to company

procedures and the entire project was riddled with fraud. The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."  The TCU also concluded that Petrobras' management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls." According to the Company's press release on April 22, 2015, a TCU report found that Petrobras will pay $21.6 billion to complete Comperj, 59.2% more than those company had informed to investors and Public Authorities in 2014.

86.    Costa confirmed in his sworn testimony in September 2014 that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, which included many Comperj contracts, inflating each contract by up to 20% and including a 3% bribe payment. Moreover, Barusco testified before the Brazilian courts that three Comperj projects valued at over 4.2 billion reais were used to funnel bribes to Petrobras executives.

87.    According a April 20, 2015 Reuters news article, at least 23 contractors responsible for Comperj projects were implicated in the criminal proceedings examining the bribery scheme at Petrobras.

88.    **SBM Offshore Projects.** Petrobras' international projects prior to and during the Relevant Period were also riddled by fraud and impropriety. SBM Offshore N.V. ("SBM"), a Dutch engineering company, owns and operates the world's largest fleet of floating production storage and offloading units, and was a key partner for Petrobras in its expansion projects, especially in relation to the development of the Company's pre-salt fields.

89.    Allegations of bribery from Petrobras to SBM Offshore were raised in the media in early 2014.  In response, on February 13, 2014, Petrobras announced that it had launched an internal investigation to uncover any improprieties. Less, than two months later, on March 31,

2014, the Company announced the "Completion Of Internal Verification," stating    that "Petrobras announces that the Internal Investigation Commission, created on 02/13/2014, to look into accusations of supposed bribe payments made to employees of the Company, involving the company SBMOffshore, concluded that, based on work performed and limited to its regulatory scope, ***no facts or documents were found that prove the payment of bribes to employees of Petrobras***."   The Company further attempted to assuage shareholders of any wrongdoing in the Company's 2013 20-F, filed on April 30, 2014, stating that " [o]n March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

90.     As discussed below at ¶¶ 133-136, allegations of bribery continued throughout the Relevant Period, and the Company continued to deny any wrongdoing.

91.     In November 2014, SBM Offshore announced that it had found rampant bribery involving its contract with Petrobras, dating back to at least 2007. This bribery was confirmed by Defendant Foster on November 17, 2014.

92.     Transpetro was created in 1998 by act of the Federal Government as a fully owned subsidiary of Petrobras to be the oil and gas transportation arm of the Company. Transpetro was touted by the Company as a key component of their operations. The Company further stated that Transpetro operated according to all relevant regulations and adhered to a competitive bidding process.

93.     Testimony from Barusco and Costa directly contradict the Company's assertions and assurances that Transpetro was operated in a non-fraudulent manner. According to a February 6, 2015, news article in *Folha de Sao Paulo,* Barusco testified that at least 21 contracts totaling $22 billion involving shipyards operated by Transpetro were used to funnel bribes to

Petrobras executives and affiliated politicians. Costa has claimed that he personally was paid a $500,000 bribe by Transpetro's then CEO, Machado, for shipping contracts.

94.     On November 3, 2014, Petrobras issued a release that reported that José Sergio de Oliveira Machado, the CEO of Transpetro, presented a letter to the Board of Directors requesting a non-paid leave for the next 31 days. It was then widely reported elsewhere that the departure of Machado was not voluntary, but in fact,  PriceWaterhouseCoopers that demanded the Company remove Sergio Machado and refused to sign off on quarterly financial results on which his signature appeared.

95.     The above-referenced projects show that prior to and during the Relevant Period, the Company was not operating according to its stated procedures and controls, and was violating numerous regulations and law and accounting conventions. As enumerated in the testimony of Barusco and Costa, the bribery and fraud occurring at the Company was widespread and affected key projects owned and operated by Petrobras.

96.     Prior to and during the Relevant Period, Petrobras was required to account for its project asset values, costs, and income according to GAAP and IFRS rules. For instance, in its 2012 and 2013 Forms 20-F, Petrobras adopted the historical cost approach of IAS 16 and ASC 360, representing that:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

97.     These representations were demonstrably false, and Petrobras' accounting for the bribes and overpayments violated GAAP and IFRS. The Company violated GAAP and IFRS requirements by reporting amounts paid out in bribes and inflated contract prices as PP&E.

Due to these repeated violations, Petrobras reported materially overstated amounts for PP&E and total assets prior to the Relevant Period and continued the fraud throughout the entirety of the Relevant Period.

98.     Below is a table summarizing a series of announcements which overstated Petrobras' PPE assets, both prior to the Relevant Period and during the Relevant Period:

| Date | Total Assets | Net PPE |
|------|--------------|---------|
| February 4, 2013 | $332 billion | $205 billion |
| April 26, 2013 | $345 billion | $214 billion |
| August 9, 2013 | $338 billion | $204 billion |
| October 25, 2013 | $340 billion | $208 billion |
| February 25, 2014 | $321 billion | $228 billion |
| April 30, 2014 | $321 billion | $228 billion |
| August 11, 2014 | $363 billion | $254 billion |

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements & Omissions Made Available During the Relevant Period

99.     Throughout the Relevant Period, Petrobras made available an array of documents that contained statements attesting to the controls and procedures within the Company – specifically including anti-corruption policies and procedures – and to the officers' and directors' stated ethical duties and obligations  Accordingly, throughout this time, Petrobras also made available to investors what it described as its Corruption Prevention Program Manual, as well as its Code of Ethics and its Conduct Guide, each of which mandated and required that those within Petrobras were prohibited from committing exactly the type of bribery, fraud and gross misconduct that became evident as a result of the *Lava Jato* investigation.  At all times, Plaintiff

33

relied upon the statements contained in the Company's Conduct Guide, Code of Ethics and Corruption Prevention Manual, and relied upon Defendants' representations that these standards were being adhered to and enforced within Petrobras.

100.    **Corruption Prevention Program**. At all relevant times, Petrobras maintained a Manual that specified the Company's purported Corruption Prevention Program. This Manual contained a statement by Defendant Foster which stated that, at all relevant times, Petrobras maintained a ***"zero tolerance" policy to fraud and corruption*** in the Company's activities and businesses. In addition, the Corruption Prevention Manual also stated that Petrobras was and is ***"committed to rejecting any practices of corruption and bribery***," and that the Company maintained and continues to maintain adequate controls and procedures reasonably adequate to ensure proper compliance with all laws related to government and private business.

101.    The Corruption Prevention Manual also stated that Petrobras is committed to ***rejecting*** support and contributions to political parties or political campaigns for candidates standing for elective office.

102.    The Corruption Prevention Manual also stated that Petrobras is committed to keeping business records that "faithfully reflect" the Company's operations, as follows:

> ***Petrobras' internal control environment provides a reasonable guarantee that our transaction authorizations and records are properly maintained***, in order to permit the production and disclosure of financial reports free from distortions and in compliance with Brazilian and international legislation and accounting standards.
>
> ***Our internal controls concerning our financial reports are tested annually*** by internal auditors and by an independent audit.

103.    The statements made by Defendants and contained in the Company's Corruption Prevention Program Manual were materially false and misleading when made, and were known by Defendants to be false throughout the Relevant Period or were recklessly disregarded as such.

34

At all relevant times, Defendants caused or were allowing Petrobras to record billions of dollars of over-inflated contract costs and bribes as corporate assets. Defendants rendered Petrobras' financial statements materially false and misleading by reporting billions of dollars in project over-payments and bribes to politicians, handlers and Petrobras' employees as assets on its balance sheet, as Property Plant & Equipment, the effect of which was to artificially inflate the value of Petrobras, while under-valuing its true costs and liabilities.

104.    Therefore, contrary to the statements by Defendants, throughout the Relevant Period, Defendants and the Company were not maintaining a "zero tolerance" policy to fraud pursuant to the Corruption Prevention Program, but rather were ignoring and actively covering up fraudulent activities at Petrobras.  Additionally, the Company's statement in the Corruption Prevention Manual, that Petrobras was and is committed to rejecting any practices of corruption and bribery, was materially false and misleading. In truth, numerous employees, including high level executives, were engaging in a massive bribery scheme affecting major contracts at the Company. Moreover, the Company's statement that it was committed to rejecting support and contributions to political parties or political campaigns was materially false and misleading as the Company was routinely funneling bribe money to political candidates and political parties.

105.    Defendants and the Company were also not keeping business records that properly faithfully reflected the Company's operations or maintaining an internal control environment that would reasonably guarantee accurate financial reports. Instead, Defendants and the Company were ignoring and actively covering up fraudulent activities at Petrobras that caused it to record billions of dollars of over-inflated contract costs and bribes as assets.

106.    **Petrobras' Code of Ethics.** The Company's Code of Ethics stated, and at all relevant times stated that Petrobras and its employees, officers and directors are guided by the

following principles, including: "integrity," "truth," "honesty," "justice," "equity," "institutional loyalty," "responsibility," "transparency," "legality" and "coherence between speech and practice." In addition, the Code of Ethics also imposed the following responsibilities and requirements upon management and the Board:

**1 - Regarding practice of Corporate Governance, Petrobras System undertakes to:**

1.2 ***conduct its business with transparency and integrity, creating credibility with its shareholders, investors, employees, supplier**s, customers, consumers, government, media, communities where it operates and society in general, pursuing **to achieve growth and profitability with social and environmental responsibility***;

* * *

1.5 ***promote honest and fair negotiations***, without receiving inappropriate advantage through manipulation, use of insider information and other practices of such nature;

1.6 ***register its reports and statements in a correct, consistent, accurate and complete way***, without ambiguous information and make its ledgers available with ***full transparency to internal and external audits and relevant public agencies***;

* * *

1.8 ***conduct a transparent, true and correct communication***, easily understandable and accessible to all interested parties, and advertising based on the principles set forth in this Code of Ethics;

[Emphasis added.]

107.     Regarding its relation with Suppliers, Service Providers and Trainees, the Petrobras Code of Ethics states that executives and board members could be expected to:

4.3 ***select and hire suppliers and service providers based on criteria strictly legal and technical of quality, cost and timeliness,*** and demand an ethics profile in their management and social and environmental responsibility practices, refusing unfair competition, child labor, forced or compulsory labor practices, and other practices contrary to the principles of this Code, including the production chain of such suppliers;

[Emphasis added.]

108.    Regarding relation with the Government and State, the Petrobras Code of Ethics stated that executives and board members could be expected to:

> 8.8 *refuse any corrupt and bribery practices*, keeping formal procedures for control and consequences of any transgressions;

> 8.9 *refuse support and contributions to political partie*s or political campaigns of candidates for elective offices;

[Emphasis added].

109.    The statements made by Defendants and contained in the Company's Code of Ethics were each materially false and misleading at all relevant times, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others: at all relevant times, Defendants caused or allowed  Petrobras to record billions of dollars of over-inflated contract costs and bribes as corporate assets.  As a result, it was not true that Defendants were complying with the Company's Code of Ethics, or its stated policies and procedures regarding corruption prevention or avoidance. In violation of the Company's Code of Ethics, Defendants rendered Petrobras financial statements materially false and misleading by reporting billions of dollars in project over-payments and bribes to politicians, handlers and Petrobras' employees as assets on its balance sheet, as Property Plant & Equipment, the effect of which was to artificially inflate the value of Petrobras, while under-valuing its true costs and liabilities.

110.    Therefore, Defendants and the Company were not conducting Petrobas' business with transparency or integrity, as stated in section 1.2 of the Code of Ethics. Moreover, the bribery underlying every major contract was not promoting or otherwise reflective of honest and fair negotiations, as stated in section 1.5 of the Code of Ethics, but reflected a scheme of corruption and cartelization. Defendants and the Company were also not registering Petrobras'

reports and statements in a correct, consistent, accurate, and complete way, as stated in section 1.6 of the Code of Ethics. Additionally, Defendants and the Company were not communicating transparently, truly, or correctly, as stated in section 1.8 of the Code of Ethics.

111.    Additionally, Defendants and the Company were not selecting and hiring suppliers and service providers based on criteria strictly legal and technical of quality, and cost and timeliness, pursuant to section 4.3 of the Code of Ethics. Instead, Defendants and the Company were selecting suppliers and service providers based on an extensive bribery and graft scheme. Defendants and the Company were also violating sections 8.8 and 8.9 of the Code of Ethics as the Company was not refusing any corrupt or bribery practices or refusing support and contributions to political parties, but rather, it was soliciting and delivering bribes that were paid directly to numerous political parties in Brazil.

112.    **Conduct Guide**. The Petrobras Conduct Guide was also made available to Plaintiff and investors during the Relevant Period. The Petrobras Conduct Guide is purportedly composed of practical measures to aid in implementation of the Petrobras Code of Ethics, which together make up the basic rules for ethical action at the Company. The Conduct Guide states that executives and board members were acting in accordance with the following policies and procedures, including:

> 4.1.3 *Act with honesty, impartiality, respect and transparency in your activities,* without obtaining improper advantages, in order to ensure the construction of wholesome, contributory and lasting relations between Petrobras and its stakeholders;
>
> 4.1.4 *Do not imply, request, demand or accept, nor offer, promise or give any kind of favor, advantage, benefit, donation, gratuity or bribe, for the benefit of yourself or another person, in exchange for actions by yourself or third parties*;
>
> 4.5.1 *Do not use Petrobras' property for private purposes* or other purposes that are not directly related to the company's activities and businesses;

[Emphasis added].

113.    The Petrobras Conduct Guide specifically defines and prohibits Fraud and Corruption, as follows:

4.6 **Fraud and Corruption**. For the purposes of applying this guide, *fraud means any intentional action or omission aimed at injuring or deceiving another person*, capable of resulting in a loss for the victim and/or an improper advantage, material or otherwise, for the author or third parties. *It is also characterized by a false declaration or omission of material circumstances in order to lead or induce third parties to make a mistake.*

For the purposes of applying this guide, *corruption means any direct or indirect action consisting of authorizing, offering, promising, requesting, accepting, delivering or receiving an improper advantage, of economic nature or otherwise*, involving individuals or legal entities, public agents or otherwise, with the aim of making someone do or not do a given act.

**Petrobras requires the following:**

4.6.1 *Reject and report situations of fraud and corruption*, of any kind, direct or indirect, active or passive, whether or not involving monetary values;

4.6.2 *Do not imply, request, accept or receive kickbacks, bribes or any other improper advantages;*

4.6.3 *Do not imply, promise, offer or pay kickbacks, bribes* or any other improper advantages.

[Emphasis added].

114.    The statements made by Defendants and contained in the Company's Conduct Guide were materially false and misleading throughout the Relevant Period, and were known by Defendants to be false and misleading at that time or were recklessly disregarded as such thereby. At all relevant times, as Defendants caused or were allowing Petrobras to record billions of dollars of over-inflated contract costs and bribes as corporate *assets*, it was not true that Defendants were complying with the Company's Conduct Guide, nor was it true that Defendants were complying with Petrobras' stated policies and procedures regarding corruption prevention

39

or avoidance. In violation of the Company's Conduct Guide, Defendants rendered Petrobras' financial statements materially false and misleading by reporting billions of dollars in project over-payments and bribes to politicians, handlers and Petrobras' employees as *assets* on its balance sheet, as Property Plant & Equipment, the effect of which was to artificially inflate the value of Petrobras, while under-valuing its true costs and liabilities.

115.    Therefore, at all relevant times, Defendants and the Company were not acting with honesty, impartiality or transparency in the Company's activities pursuant to Section 4.1.3 of the Conduct Guide. In reality, numerous Petrobras employees were engaging in corruption, graft, favoritism, and bribery on a regular basis. The bribery underlying every major contract also rendered section 4.1.4 of the Conduct Guide materially false and misleading, as key executives at the Company were demanding, accepting, and promising bribes and other benefits. By using Company funds from project contracts as the funding for this bribery scheme, the Company's statements in section 4.51 of the Code, prohibiting the use of Petrobras' property for private purposes, was also materially false and misleading. In truth, Petrobas' property was used to further scheme of corruption and cartelization.

116.    Moreover, Defendants and the Company were also not rejecting or reporting instances of fraud, as they state in section 4.61 of the Conduct Guide, but rather were ignoring and actively covering up fraudulent activities at the Company. Moreover, the Company's statements that it was in compliance with section 4.6.2 and 4.6.3 of the Conduct Guide, which required that Defendants and the Company not pay or receive bribes or kickbacks, were also materially false, as numerous employees, including high level executives were engaging in a massive bribery scheme affecting major contracts at Petrobras.

117.     Prior to the inception of the Relevant Period, on April 29, 2013, Petrobras filed its 2012 Form 20-F, or Annual Report, with the SEC.  As Plaintiff and investors would ultimately learn, the financial statements and representations regarding the operations of the Company and contained in this Annual Report were materially false and misleading, and these statements were not corrected at any time during the Relevant Period.

118.     The 20-F was signed by Defendants Barbassa and Foster, who also signed certifications pursuant to Sarbanes-Oxley Act which stated that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company."

119.     The 20-F also stated that Petrobras's financial statements were "prepared in accordance with International Financial Reporting Standards, or IFRS, issued by the International Accounting Standards Board, or IASB."

120.     The 2012 Annual Report also stated that:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control—Integrated Framework [(1992)] issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31 [of the reporting year].

121.     In addition to the foregoing, the 2012 Annual Report also stated, in part, that:

> *Property, plant and equipment are measured at the cost to acquire or construct*, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

122.     The Annual Report also contained certifications by Defendants Barbassa and Foster that stated:

41

The Company's other certifying officer and I . . . have:

* * *

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

* * *

The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting

123. The statements made by Defendants and contained in the Company's purported 2012 Annual Report were materially false and misleading when made, and were known by Defendants to be false throughout the Relevant Period or were recklessly disregarded as such. At all relevant times, Defendants caused or allowed Petrobras to record billions of dollars of over-inflated contract costs and bribes as corporate assets. Defendants rendered Petrobras' financial statements materially false and misleading by reporting billions of dollars in project over-payments and bribes to politicians, handlers and Petrobras' employees as assets on its balance sheet, as Property Plant & Equipment, the effect of which was to artificially inflate the value of Petrobras, while under-valuing its true costs and liabilities.

124. Therefore, the Company's statements regarding its property, plant and equipment assets, as well as the Company's representations that it was fairly presenting the financial

condition and results of operation of the Company were materially false and misleading because the Company's assets and financial condition, as reported, were grossly inflated and were achieved, in part, through illegal activities. Additionally, Defendants' statements regarding the internal controls over financial reporting were materially false and misleading because Defendants were ignoring and actively covering up fraudulent activities at the Company and recording billions of dollars of over-inflated contract costs and bribes as corporate assets.

### Defendants' Materially False and Misleading Statements & Omissions Made During the Relevant Period

125.    On March 7, 2014, the inception of the Relevant Period, Defendants published a release, filed with the SEC pursuant to Form 6-K signed by Defendant Barbassa, that reported on the purported effectiveness of the Company's internal controls over financial reporting. This release stated, in part, the following:

**Management's Report on Internal Control over Financial Reporting**

Petrobras announces that its ***management is responsible for establishing and maintaining effective internal control over financial reporting*** and for its assessments of the effectiveness of internal control over financial reporting.

***Our internal control over financial reporting is a process designed by, or under the supervision of our Audit Committee and ours Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel*** to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with IFRS, as issued by the IASB.

* * *

***Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013***, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.***

* * *

43

*The effectiveness of our internal control over financial reporting as of December 31, 2013, has been audited by PricewaterhouseCoopers Auditores Independentes*, an independent registered public accounting firm, as stated in their report dated February 25, 2013 included in our 2013 Audited Financial Statements.

[Emphasis added].

126.    The March 10, 2014 Form 6-K/A included Petrobras' consolidated financial results for the year ended December 31, 2013. According to this report, Petrobras posted **"Property, Plant & Equipment" assets valued at $227.901 billion**. The consolidated financial statements defined PPE, in part, as follows:

**3.8.    Property, plant and equipment**

*Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use*, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

*Expenditures on major maintenance of industrial units and vessels are capitalized if the recognition criteria are met*. Expenditures comprise: replacement of certain assets or parts of assets, equipment assembly services, *as well as other related costs*. Such maintenance occurs, on average, every four years. Capitalized expenditures are depreciated on a straight line basis based on the estimated time of the maintenance cycle.

[Emphasis added].

127.    Among other critical accounting provisions, the March 10, 2014 Form 6-K/A also reported the purported "Basis of Presentation," "Provisions for Contingent Liabilities," and "Recognition of Revenue, Costs and Expenses," as follows:

**Basis of preparation**

**2.1.    Statement of compliance and authorization of financial statements**

*The consolidated financial information has been prepared and is being presented in accordance with the International Financial Reporting Standards* (IFRS) as issued by the International Accounting Standards Board (IASB)...

44

The financial statements have been prepared under the historical cost convention, as modified by available-for-sale financial assets, financial assets and financial liabilities measured at fair value and certain current and non-current assets and liabilities...

The annual consolidated financial information was approved and authorized for issue by the Company's Board of Directors in a meeting held on February 25, 2014.

### 3.14.  Provisions and contingent liabilities

Provisions are recognized when there is a present obligation (legal or constructive) that arises from past events and for which it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation, which must be reasonably estimable.

***Contingent liabilities for which the likelihood of loss is considered to be possible or which are not reasonably estimable are not recognized in the financial statements but are disclosed unless the expected outflow of resources embodying economic benefits is considered remote***.

### 3.19.  Recognition of revenue, costs and expenses

Finance income and expense mainly comprise interest income on financial investments and government bonds, interest expense on debt, gains and losses on marketable securities measured at fair value, as well as net foreign exchange and inflation indexation charges. ***Finance expense does not include borrowing costs directly attributable to the construction of assets that necessarily take a substantial period of time to become operational, which are capitalized as part of the costs of these assets.***

Revenue, costs and expenses are recognized on the accrual basis.

[Emphasis added].

128.    The statements made by Defendants and contained in the Company's March 7, 2014, press release and Form 6-K filing regarding its internal controls over financial reporting were materially false and misleading because:

a.      at all relevant times, it was not true that Defendants maintained adequate

systems of internal operational or financial controls which were purported

45

to guarantee that Petrobras' reported financial statements were true, accurate or reliable. In fact, as Defendants knew or were reckless in not knowing, at no time during the Relevant Period were Petrobras' financial statements true, accurate or reliable;

b.    at all relevant times, it was not true that the Company's financial statements and reports were prepared in accordance with IFRS, GAAP or SEC rules;

c.    as a result of Defendants' causing or allowing Petrobras to engage in bribery and bid-rigging and then burying these costs on the Company's balance sheet, Defendants knew or recklessly disregarded that the Company's stated codes of ethics, conduct and fraud prevention were being ignored and disregarded, such that Plaintiff could not rely on Defendants' candor, honesty or truthfulness in their deeds or disclosures, and throughout the Relevant Period Defendants lacked any reasonable basis to claim that Petrobras was operating according to plan, or that Petrobras could achieve guidance sponsored and/or endorsed by Defendants;

d.    at all relevant times, Defendants reported the payment of billions of dollars in project over-payments and bribes to politicians, handlers and Company employees as assets, including Property Plant & Equipment, that was reported on Petrobras' balance sheet, and which had the effect of artificially inflating the value of the Company's assets while under-

reporting true costs and liabilities, so that throughout the Relevant Period,

Petrobras' financial statements were materially false and misleading; and

e.  at all relevant times, Defendants materially overstated the Company's

asset values, include Property Plant & Equipment, because the costs

associated with the bribe-related expenses to contractors had been

capitalized as part of the assets' valuations when recorded on Petrobras'

balance sheet, resulting in the artificial inflation of assets and a materially

misleading financial statement and balance sheet, which relied upon such

inflated asset values.

129.   Taking advantage of the artificial inflation in the price of Petrobras' shares that the publication of the materially false and misleading information issued by Defendants had caused, the same day, March 10, 2014, Petrobras filed with the SEC pursuant to Form 424B2 a prospectus in connection with the sale of $8.5 billion of debt securities. The March 10, 2014, bond offering prospectus incorporated by reference the Company's Report on Form 6-K furnished to the SEC on February 26, 2014, containing audited consolidated financial statements for the years ended December 31, 2013, 2012 and 2011, in U.S. dollars, purportedly prepared in accordance with IFRS as issued by the International Accounting Standards Board (the "Audited Financial Statements"); the related amendment on Form 6-K/A, furnished to the SEC on March 10, 2014; and the March 7, 2014 Report on Internal Control Over Financial Reporting.

130.   The "Overview" section of the consolidated financial results contained in the Prospectus, also reported that the Company "expenses" are limited to the following:

- *costs of sales* (comprised of direct labor expenses, operating costs and purchases of crude oil and oil products); *property, plant and equipment maintenance and repairs; depreciation and amortization of fixed assets; depletion of oil fields; and oil and gas exploration costs*;

- *selling* (which include expenses for transportation and distribution of our products), *general and administrative expenses;*

- *research and development and other operating expenses*; and

- *interest expense, inflation indexation and foreign exchange variation losses on debt* and other financial instruments.

[Emphasis added].

131.     The statements contained in the Company's March 10, 2014 prospectus issued in connection with Petrobras $8.5 billion debt security offering, were each materially false and misleading when made and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

   a.  At all relevant times, Defendants reported the payment of billions of dollars in project over-payments and bribes to politicians, handlers and Company employees as assets, including Property Plant & Equipment, that was reported on Petrobras' balance sheet, and which had the effect of artificially inflating the value of the Company's assets while under-reporting true costs and liabilities, so that throughout the Relevant Period, Petrobras' financial statements were materially false and misleading;

   b.  At all relevant times, Defendants materially overstated the Company's asset values, include Property Plant & Equipment, because the costs associated with the bribe-related expenses to contractors had been capitalized as part of the assets' valuations when recorded on Petrobras' balance sheet, resulting in the artificial inflation of assets and a materially misleading financial statement and balance sheet, which relied upon such inflated asset values; and

      c.  at all relevant times, it was not true that Defendants maintained adequate systems of internal operational or financial controls which were purported to guarantee that Petrobras' reported financial statements were true, accurate or reliable. In fact, as Defendants knew or were reckless in not knowing, at no time during the Relevant Period were Petrobras' financial statements true, accurate or reliable.

132.    On March 17, 2014, Petrobras announced that the majority of the Board of Directors had approved the report of financial statements for the year ended December 31, 2013. While one director, Mauro Rodrigues da Cunha ("Cunha"), presented a dissident vote to this approval it was reported that he did so only as a result of the following: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) lack of information and apparent accounting inadequacy of refinery investments. At that time, and throughout the Relevant Period no further action was taken by Director Cunha or the Board regarding the Company's financial statements, and the financial statements for 2Q:14 were approved.

133.    On April 14, 2014, energy news website *SweetCrude.com* reported that Brazil's federal police raided the headquarters of Petrobras in Rio de Janeiro as part of the *Lava Jato* money-laundering probe. At that time, Petrobras took immediate steps to distance itself from the prior actions of Costa and to deny that the fraud, bribery or money laundering allegations had any relation to the Company. According to the *SweetCrude.com* report, Petrobras said that federal police agents contacted Defendant Foster and the Company provided documentation relating to only <u>one, "specific contract."</u> At that time, Defendants again failed to disclose and continued to conceal the magnitude of the fraud and its connections to the Company. Instead, at

that time Defendants simply feigned surprise and then stated that the police investigation related to only one contract with Petrobras and that there was no material link to the Company. This statement was designed to and did imply that the Costa's confessions were not likely to adversely affect Petrobras.

134.    Not only did Defendants fail to disclose the impact of the massive bribery and bid-rigging scheme or how it implicated Petrobras, at that time, but Defendants then took further steps to obfuscate and hide this multi-billion scheme. By that time, police and prosecutors in Europe, the US and Brazil had announced that they were looking into allegations that Dutch oil-ship leaser SBM Offshore bribed Petrobras officials to win vessel contracts. Almost immediately, Petrobras said that it had <u>already</u> completed an internal investigation of the SBM allegations and found <u>no sign of wrongdoing</u>.

135.    The Company's statements denying any wrongdoing relating to SBM Offshore contracts were materially false and misleading because numerous employees, including high level executives were engaging in a massive bribery scheme affecting major contracts at the Company. Defendants knew or were reckless in not knowing, that at all times during the Relevant Period, Petrobras's financial statements were materially false and misleading by reporting billions of dollars in project over-payments and bribes to politicians, handlers and Petrobras' employees as assets on its balance sheet, as Property Plant & Equipment, the effect of which was to artificially inflate the value of Petrobras, while under-valuing its true costs and liabilities.

136.    On April 30, 2014 when Defendants filed the Company's Annual Report pursuant to Form 20-F signed and certified by Defendants Foster and Barbassa, they stated that there was

no evidence of any bribery involving SBM Offshore and Petrobras. The 2013 Form 20-F stated, in part, the following:

Internal Commissions

*We periodically establish ad hoc internal* commissions (comissões internas de apuração) *to evaluate our compliance with applicable regulations*. The scope of each internal commission is established by our management. Upon the conclusion of each internal commission´s evaluation, its material findings will be publicly disclosed and the results used to improve our compliance efforts.

*On March 31, 2014, <u>our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations.</u>*

[Emphasis added].

137.    In addition to the foregoing, Petrobras' 2013 Form 20-F reported that, at December 31, 2013, the Company had **Property, Plant & Equipment assets valued at $227.901 billion**.   For the year ended December 31, 2013, the Company also reported, under IFRS, "Net income before financial results, profit sharing and income taxes" of $16.214 billion, and "Net income attributable to the shareholders of Petrobras" of $11.094 billion.  As will be shown herein, these figures were vastly overinflated.  In fact the Company has admitted as much – In the Third Quarter of the following year 2014, the Company would write off $2.527 billion in property, plant and equipment.  The Company euphemistically labeled the write-off as "overpayments incorrectly capitalized," but does not dispute that this figure relates to the "Lava Jato (Car Wash)" investigation.

138.    The 2013 Form 20-F also contained statements that purporting to attest to the sufficiency and efficacy of the Company's "Control and Procedures," stating as follows:

Our management is responsible for establishing and maintaining effective internal control over financial reporting and for its assessments of the effectiveness of internal control over financial reporting.

51

Our internal control over financial reporting is a process designed by, or under the supervision of our Audit Committee and our Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel to provide **reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with IFRS, as issued by the IASB**.

***

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, **the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.** On May 14, 2013, COSO published an updated Internal Control - Integrated Framework (2013) and related illustrative documents. As of December 31, 2013, the company is utilizing the original framework published in 1992. The transition period for adoption of the updated framework ends on December 15, 2014.

[Emphasis added].

139.    The 2013 Form 20-F contained Certifications, signed by Defendants Foster and Barbassa, that purported to attest to the completeness and accuracy of the financial statements contained in the 2013 Form 20-F, and to its compliance with GAAP, as follows:

4.    *The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

*        *        *

(b)    *Designed such internal control over financial reporting*, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

*     *     *

5.   The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*** which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)   ***Any fraud, whether or not material***, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

/s/ Maria das Graças Silva Foster                    Date: April 30, 2014
**Maria das Graças Silva Foster**
Chief Executive Officer and Chief International Officer

*  *  *

/s/ Almir Guilherme Barbassa                         Date: April 30, 2014
**Almir Guilherme Barbassa**
Chief Financial Officer and Chief Investor Relations Officer

[Emphasis added].

140.   The statements made by Defendants and contained in the Company's March 17, 2014 releases, the statements made by Defendants and reported by the media on April 14, 2014, and the Forms 6-K and Form 20-F, dated March 17, 2014 and April 30, 2014, respectively, were each materially false and misleading when made and were know by Defendants to be false at that time or were recklessly disregarded as such thereby:

a.   at all relevant times, Defendants reported the payment of billions of dollars in project over-payments and bribes to politicians, handlers and Company employees as assets, including Property Plant & Equipment, that was reported on Petrobras' balance sheet, and which had the effect of artificially inflating the value of the Company's assets while under-reporting true costs and

liabilities, so that throughout the Relevant Period, Petrobras' financial statements were materially false and misleading;

b.  at all relevant times, Defendants materially overstated the Company's asset values, include Property Plant & Equipment, because the costs associated with the bribe-related expenses to contractors had been capitalized as part of the assets' valuations when recorded on Petrobras' balance sheet, resulting in the artificial inflation of assets and a materially misleading financial statement and balance sheet, which relied upon such inflated asset values;

c.  at all relevant times, it was not true that Defendants maintained adequate systems of internal operational or financial controls which were purported to guarantee that Petrobras' reported financial statements were true, accurate or reliable. In fact, as Defendants knew or were reckless in not knowing, at no time during the Relevant Period were Petrobras' financial statements true, accurate or reliable; and

d.  at all relevant times, it was not true that the Company's financial statements and reports were prepared in accordance with IFRS, GAAP or SEC rules.

141.  With Company shares trading above $15.00, on May 9, 2014, Defendants announced purported results for the first quarter of 2014, ended March 31, 2014. According to *Reuters*, Petrobras reported net income of $2.43 billion in the quarter, compared with $3.47 billion a year earlier. The results were in line with the average estimate of 11 analysts surveyed. Following the publication of these results, however, *Reuters* reported that Petrobras had "the highest debt levels and lowest profitability of any major oil company."

142.    On May 12, 2014, Petrobras filed with the SEC, pursuant to Form 6-K signed by Defendant Barbassa, its financial results for 1Q:14, the period ended March 31, 2014. In addition to reporting the financial information previously announced, the 1Q:14 Form 6-K also reported Petrobras' **Property, Plant & Equipment of $240.793 billion**. Also contained in the 1Q:14 Form 6-K were "Comments from the CEO," which quoted Defendant Foster, in part, as follows:

> *I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with <u>ethics and transparency</u> at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program.* All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.
>
> Finally, I would like to share with our shareholders and investors the results achieved so far with our Voluntary Separation Incentive Plan [PIDV]. 8,298 employees have enrolled, representing 12.4% of the company's total workforce.
>
> * * *
>
> This program – PIDV - is *another example of our commitment to the relentless pursuit of increased efficiency, productivity and <u>capital discipline</u>* that will lead us to better results and to the creation of value for our shareholders and investors.

[Emphasis added].

143.    The 1Q:14 Form 6-K also reported the basis for preparation of Petrobras interim financial information, which again purported that "the consolidated interim financial information has been prepared and is being presented in accordance with IAS 34 – Interim Financial Reporting as issued by the International Accounting Standards Board." The 1Q:14 Form 6-K also reported that it should be "read together with the Company's annual financial statements for the year ended December 31, 2013," which include all of the notes to the consolidated financials. The 6-K also stated that the 6-K "is fairly stated in all material respects in relation to the consolidated balance sheet from which it has been derived."

144.    The consolidated interim financial information was approved and authorized for issue by the Company's Board of Directors in a meeting held on May 9, 2014.

145.    The statements made by Defendants and contained in the Company's May 12, 2014 releases and in the May 12, 2014 Form 6-K, were each materially false and misleading when made and were know by Defendants to be false at that time or were recklessly disregarded because:

> a.    at all relevant times, Defendants reported the payment of billions of dollars in project over-payments and bribes to politicians, handlers and Company employees as assets, including Property Plant & Equipment, that was reported on Petrobras' balance sheet, and which had the effect of artificially inflating the value of the Company's assets while under-reporting true costs and liabilities, so that throughout the Relevant Period, Petrobras' financial statements were materially false and misleading;

> b.    at all relevant times, Defendants materially overstated the Company's asset values, include Property Plant & Equipment, because the costs associated with the bribe-related expenses to contractors had been capitalized as part of the assets' valuations when recorded on Petrobras' balance sheet, resulting in the artificial inflation of assets and a materially misleading financial statement and balance sheet, which relied upon such inflated asset values.

> c.    at all relevant times, it was not true that Defendants maintained adequate systems of internal operational or financial controls which were purported to guarantee that Petrobras' reported financial statements were true, accurate or reliable. In fact, as Defendants knew or were reckless in not knowing, at no

time during the Relevant Period were Petrobras' financial statements true, accurate or reliable; and

d.  at all relevant times, it was not true that the Company's financial statements and reports were prepared in accordance with IFRS, GAAP or SEC rules.

146.   As evidence that the falsity of Defendants' statements about the Company, on May 16, 2014, with shares continuing to trade above $15.00, Petrobras reported that Standard & Poor's (S&P) rating agency affirmed its 'BBB-' corporate credit rating and issued a "stable outlook" designation. According to Petrobras, the S&P rating was ***based on "a combination of the Company's business risk profile and financial risk profile***," as well as its "liquidity." (Emphasis added). This rating was critical to Petrobras because it allowed the Company to retain its "investment grade" credit rating.

147.   With Company shares continuing to trade above $15.00, on August 8, 2014, Defendants announced purported results for the second quarter of 2014, ended June 30, 2014. Petrobras reported earnings of $2.225 billion in the quarter, 2% lower compared to 1Q:14.  The August 8, 2014 release again contained Defendant Foster's "Comments from the CEO," which stated, in part, the following:

> I would like to draw your attention to the exceptional results achieved with the PROCOP (Operating Costs Optimization Program) structuring program, which ended the first half of the year with savings of US$ 2.1 billion, 39% higher than expected (US$ 1.5 billion). PROCOP has already completed 68% of the annual target of US$ 3.2 billion, and is set to exceed the target established for 2014.
>
> ***PROCOP continues to carry out its role of implementing and consolidating excellence in cost management in the Company's culture, and of capturing the operational synergies among the different areas of Petrobras*** and of its subsidiaries: Transpetro, BR Distribuidora, Liquigás and Petrobras Biocombustível.
>
> The result of the 614 cost optimization initiatives set forth in PROCOP, was a contribution of US$ 0.7 billion of net income in 2Q-2014. In other words, without

PROCOP we would have reported a net income of US\$ 1.5 billion instead of the US\$ 2.2 billion reported herein.

[Emphasis added].

148.   On August 11, 2014, Petrobras filed with the SEC, pursuant to Form 6-K signed by Defendant Barbassa, and certified by Defendants Foster and Barbassa, its financial results for the second quarter of 2014. In addition to reporting the financial information previously announced, the 2Q:14 Form 6-K also reported Petrobras' **Property, Plant & Equipment valued at \$253.955 billion**.

149.   The 2Q:14 Form 6-K also reported the basis of preparation of interim financial information, which again purported that "the consolidated interim financial information has been prepared and is being presented in accordance with IAS 34 – Interim Financial Reporting as issued by the International Accounting Standards Board." The 2Q:14 Form 6-K also reported that it should be "read together with the Company's annual financial statements for the year ended December 31, 2013," which includes the full set of notes to the consolidated financials. The 6-K also stated that the 6-K "is fairly stated in all material respects in relation to the consolidated balance sheet from which it has been derived."

150.   The consolidated interim financial information was approved and authorized for issue by the Company's Board of Directors in a meeting held on August 8, 2014.

151.   The statements made by Defendants and contained in the Company's August 8, 2014 release and Petrobras Form 6-K, dated August 11, 2014, respectively, were each materially false and misleading when made and were know by Defendants to be false at that time or were recklessly disregarded as such thereby because:

        a.   at all relevant times, Defendants reported the payment of billions of dollars in project over-payments and bribes to politicians, handlers and Company

employees as assets, including Property Plant & Equipment, that was reported on Petrobras' balance sheet, and which had the effect of artificially inflating the value of the Company's assets while under-reporting true costs and liabilities, so that throughout the Relevant Period, Petrobras' financial statements were materially false and misleading;

b.  at all relevant times, Defendants materially overstated the Company's asset values, include Property Plant & Equipment, because the costs associated with the bribe-related expenses to contractors had been capitalized as part of the assets' valuations when recorded on Petrobras' balance sheet, resulting in the artificial inflation of assets and a materially misleading financial statement and balance sheet, which relied upon such inflated asset values;

c.  at all relevant times, it was not true that Defendants maintained adequate systems of internal operational or financial controls which were purported to guarantee that Petrobras' reported financial statements were true, accurate or reliable. In fact, as Defendants knew or were reckless in not knowing, at no time during the Relevant Period were Petrobras' financial statements true, accurate or reliable; and

d.  at all relevant times, it was not true that the Company's financial statements and reports were prepared in accordance with IFRS, GAAP or SEC rules.

152.  On September 6, 2014, with Petrobras ADSs trading above $19.50, *Agence France Presse* reported that dozens of politicians in Brazil had been exposed and implicated in connection with Operation *Lava Jato*'s bribery investigation. According to *Agence France*, Paulo Roberto Costa, the former head of Petrobras refining and supply unit, who is accused of

money laundering and faces up to 30 years in prison if found guilty, was quoted as saying: "There was a politician knocking at my door every single day." According to Costa, who was then talking to investigators as part of a plea deal, the lawmakers received 3% commissions (*i.e.* bribes) on the value of the contracts signed by Petrobras while he served as director of refining and supply from 2004 to 2012.  Costa also stated that contracts were signed with a string of companies outside Petrobras in an attempt to conceal any wrongdoing. As part of his cooperation agreement, Costa had named dozens of lawmakers and senior officials which he said received bribes and kickbacks from Petrobras.

153.    At or about the same time, *Folha de Sao Paulo* (Brazil) reported that 49 deputies, 12 senators and several state governors were named as being involved in the bribery and bid-rigging scheme. *Globo* (Brazil) daily linked at least 25 lawmakers to the scam. *Veja* news magazine (Brazil) also reported that politicians named in the *Lava Jato* bribery and bid-rigging case include former Rio governor Sergio Cabral, whose center-right Brazilian Democratic Movement party is in the ruling coalition, Energy Minister Edison Lobao and Senate president Renan Calheiros. *Veja* also named Eduardo Campos, former governor of Pernambuco state, who was the Socialist Party's candidate until he was killed in an August 13, 2014 plane crash.

154.    On September 8, 2014, with Petrobras ADSs trading just below $20.00, the Company published a release, filed with the SEC on Form 6-K signed by Defendant Barbassa, that purported to provide a "clarification" on the non-official information obtained from Paulo Roberto Costa's alleged testimony to the federal police. Regarding this matter, Petrobras "clarifie[d]" the following:

> 1. It is inappropriate to comment on non-official information published by media outlets…

2. Regarding its projects and businesses, Petrobras has continued to provide information to the public via its website www.petrobras.com.br, Press Releases, responses to media outlets and announcing any Material Facts. *This ensures transparency in all matters relating to the cases that are under analysis or under investigation.*

3. Furthermore, *Petrobras fully complies with its obligations and has been providing all information requested by the Federal Police* – PF, Federal Audit Court – TCU, Office of the Federal Controller General – CGU and the Public Prosecutor's Office – MP. In addition, *the company always notifies these entities of new facts and information that come to its attention.*

4. *Petrobras' management is interested in seeing the conclusion of all ongoing investigations by all such entities. The company will continue to contribute swiftly and effectively for this to happen.* In this regard, Petrobras has requested to the judge responsible for the "*Lava Jato*" operation to gain access to the information pertaining to Petrobras that has been provided by Mr. Paulo Roberto Costa within the scope of his whistleblower status…

[Emphasis added].

155.    The statements made by Defendants and contained in the Company's May 12, 2014 releases and in the May 12, 2014 Form 6-K, were each materially false and misleading when made and were know by Defendants to be false at that time or were recklessly disregarded as such thereby. The Company's statements in the 6-K were materially false and misleading because the Company was ignoring and actively covering up fraudulent activities at the company that caused the Company to record billions of dollars of over-inflated contract costs and bribes as corporate assets. Moreover, the company's assets and financial condition, as reported, were grossly inflated and were achieved, in part, through illegal activities.

### THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF PETROBRAS BEGINS TO BE DISCLOSED

156.    During the Relevant Period, Defendants engaged in a scheme and a course of conduct that artificially inflated Petrobras' ADS prices and operated as a fraud or deceit upon Plaintiff who, through its Assignors,  purchased Petrobras' ADSs during the Relevant Period.

Defendants misrepresented the Company's asset values, balance sheet and contingent liabilities, among other financial metrics. Defendants had improperly inflated Petrobras' balance sheet with over-inflated construction contracts and paid bribes.  Petrobras' Form 6-K for the Third Quarter 2014, which was delayed by months and not filed until April 23, 2015, confirmed the extent of the damage caused by Operation *Lava Jato*. In that filing, Defendants reported that the Company had artificially inflated Petrobras' assets by $14.7 billion, of which $2.364 billion of inflation related to property, plant and equipment. These amounts had to be written off. Further, Petrobras wrote off tax credits related to the affected assets, of an additional $163 million dollars.

157.    By improperly capitalizing bribes and construction contract over-payments, designed to support a long-running kickback, bribery and accounting fraud scheme, and then reporting those payments on the Company's balance sheet as inflated Property Plant & Equipment, Defendants presented a misleading image of Petrobras' business and operations. During the Relevant Period, Defendants repeatedly emphasized their ability to monitor and control Petrobras' internal operations, and consistently reported financial results and results of operations filed with the SEC, which Defendants signed and certified were prepared in conformity with generally accepted accounting principles in the U.S. and International Accounting Standards abroad. These claims caused and maintained the artificial inflation in Petrobras ADS prices throughout the Relevant Period and until the truth about the Company was ultimately revealed.

158.    Defendants' materially false and misleading statements and omissions had the intended effect of causing Petrobras' ADSs to trade at artificially inflated levels throughout the Relevant Period. During the Relevant Period Petrobras ADSs reached a trading period high of over $20.90 per share on September 3, 2014.

159.    Taking full advantage in the artificial inflation in the price of Petrobras shares that their false and materially misleading statements had caused, Defendants went to the market and sold over $8.5 billion of debt securities to investors on March 10, 2014.

160.    Beginning on or about October 15, 2014, however, shares of the Company began to collapse as the first in a series of four partial corrective disclosures was revealed to the market. On October 15, 2014, and in the days and weeks to follow, news organizations around the world began widely reporting that bribery and embezzlement were widespread throughout the Company, affecting many of the Company's major projects and involving the Company's senior executives as well as numerous Brazilian politicians and other numerous Brazilian and international construction companies. These reports directly refuted the numerous prior statements by Petrobras, including SEC filings and sworn testimony by Defendant Foster, that the Company was not involved in any fraudulent activity and that the Company was fulfilling all of its own internal policies regarding reporting, ethics compliance and all external regulations regarding accounting treatment.

161.    On October 15, 2014, two Brazilian regulatory agencies announced formal investigations into the existence of cartelization of contracts involving Petrobras's Downstream division and numerous Brazilian construction companies and provided detailed reports regarding allegations of corruption and fraud that had been ongoing at the Company. In particular, the report by the Brazilian *Tribunal de Contas da Uniao* ("TCU") noted its findings of discrepancies, "reckless" management, irregularities in the omission of technical analysis, overpaying for contracts, and a lack of effective controls.  The TCU also found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."

162.    As the truth about the Company and the facts related to the *Lava Jato* investigation began to enter the market, Plaintiff first began to learn that Defendants had failed to report the Company's financial and operational results in accordance with either international or generally accepted accounting principles. Each of the four partial corrective disclosures had an immediate, adverse impact on the price of Petrobras shares – causing the shares to drop in value on high volume.  By the time the truth was fully revealed, Petrobras ADSs fell to as low as $6.26 by December 15, 2014.

163.    As a direct result of the market learning the truth about the Company, as facts discovered in the *Lava Jato* investigation became known world-wide, from mid-October to mid-December 2014, the price of Petrobras ADSs collapsed. During that time, as a result of reports reaching the market on 10/15/14, 10/27/14, 11/17/14 and 12/12-12/15/14, almost $100 billion of Petrobras' market capitalization was eradicated. In the process, Defendants also compromised Petrobras' ability to borrow money or sell debt or equity.  Each of the Partial Revelations I-IV are discussed in detail in this section, below, at ¶¶166-189.

164.    The decline in Petrobras' share prices on October 15, 2014, October 27, 2014, November 17, 2014 and December 12-15, 2014, directly resulted from the nature and extent of Defendants' fraud being uncovered. The timing and magnitude of Petrobras' ADS price decline negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct. During the same period in which Petrobras ADS prices fell over 60% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index increased by almost 7.75%

165.    As a result of its purchases of Petrobras ADS during the Relevant Period, Plaintiff suffered substantial damages in excess of approximately $150 million U.S. dollars under the federal securities laws. The economic loss, *i.e.,* damages suffered by Plaintiff, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Petrobras ADSs, and the subsequent significant decline in the value of Petrobras ADSs when Defendants' prior misstatements and other fraudulent conduct was revealed.  The dramatic declines in the price of the Company's ADSs immediately following each of Defendants' four partial belated revelations discussed below.

**Partial Revelation I: "Reckless" Omissions Lead to Billions in Cost Overruns**.

166.    On October 15, 2014, the Administrative Council for Economic Defense ("CADE"), a Brazilian anti-corruption governmental agency, announced a formal investigation into the existence of  cartelization of contracts involving Petrobras's Downstream division and numerous Brazilian construction companies.

167.    On October 15, 2014, the TCU released documents stating that the Company was being investigated for costs overruns, with particular focus on the Comperj Complex. The TCU noted that Petrobras was set to spend 60% more than budgeted for the refinery, with final estimated costs at $21.6 billion. The TCU noted discrepancies, "reckless" management, irregularities in the omission of technical analysis, overpaying for contracts, and a lack of effective controls. According to at least one TCU investigator, the investigation was focused on how management at Petrobras could "undertake such a huge project in such a sloppy way." The investigation was also reported to be focused on ***"irregularities in three contracts:*** two that were overpaid and one that was signed in an "emergency" time-frame that didn't allow other companies to bid." (Emphasis added).

65

168.    Following the publication of this report, shares of Petrobras fell over 5.5% in the single trading day to close at $14.50 per share on October 16, 2014, compared to a close of $15.55 per share on October 15, 2014, and down from a close of $17.10 per share on October 14.

169.    The chart below indicates the rapid decline in the price of Petrobras ADSs on extraordinarily high trading volume, as the truth about Petrobras bribery and bid-rigging scheme began to be reported to Plaintiff, initially, by October 15, 2014, as follows:



170.    Nevertheless, Petrobras's ADSs continued to trade at artificially inflated levels due to the materially false statements and omissions made by the Company during the Relevant Period which had not been corrected. Namely, Plaintiff was unaware of the potential scope of the bribery and corruption, and more importantly, the potential financial impact that the corruption would have. Over the next two months, Plaintiff would learn, for the first time, the true extent of the corruption as the news trickled out at various intervals.

**Partial Revelation II: The Company Confirms The Existence of Corruption**

171.    On October 27, 2014, Petrobras published a release filed with the SEC pursuant to Form 6-K signed by Defendant Barbassa, that purported to report the "Internal steps taken by Petrobras" in response to *Lava Jato*, in part, as follows:

> Internal steps taken by Petrobras in response to "*Lava Jato* Operation"
>
> At the moment, **investigations are underway on the practice of alleged crimes committed <u>against</u> Petrobras**.
>
> In consideration of this scenario, Petrobras has taken many steps designed to carefully examine the facts, most notably the following:
>
> -        Internal Investigative Committees have been set up **to examine evidence or facts perpetrated against the company**, as well as to assist administrative measures and resulting procedures;
>
> -        **Requested access to the records of the investigation into "Lava Jato Operation,"** including records for the money laundering and criminal organization case, as a way to closely monitor the investigation, which was granted by the court;
>
> -        **Requested access to the content of the "state's evidence"** turned in by former director Paulo Roberto Costa, which has not yet been granted by the court;
>
> -        Has been **providing clarifications** to authorities (Brazilian Federal Police, Brazilian Justice Department and Brazilian Courts), including announcing measures carried out by the company;
>
> -        **Requested clarifications**, as to assist its internal inquiry, from companies cited in the media whose activities are under investigation by "*Lava Jato* Operation", especially following reverberations in the media of information regarding the cited "state's evidence."

[Emphasis added].

172.    The October 27, 2014 release also reported that Petrobras had **already begun working to recover any "deviated resources" and of the amounts "lost through the overprice of the companies that are supposedly part of the cartel**," as mentioned by former Director Costa during his congressional hearing. (Emphasis added). Despite their admitting that Petrobras had participated in the illegal conduct and that the Company would now take actions to recover the

money it paid in bribes and contract over-payments, Defendants continued to obfuscate their involvement in and liability for the massive bribery and bid-rigging scheme. As evidence of this, at that time Defendants stated that "***Petrobras reaffirms that the relevant government authorities have officially acknowledged the <u>Company as a victim</u> in this investigative procedure.***" (Emphasis added).

173.    Following the publication of this release, Petrobras ADSs traded significantly lower on huge volume. That day, October 27, 2014, over 164.885 million Petrobras ADS traded, as prices fell to $11.16 per ADS, from a prior trading day close of $12.93 per ADS. The huge trading volume and selling imbalance that led to Petrobras ADS price decline was evidence of investors' complete lack of confidence in the Company. Moreover, it appears that the public also did not accept Defendants' excuse that Petrobras was the victim of rogue employees who engineered hundreds of millions of dollars in bribes to the highest levels of government, and also made billions of dollars in illicit contract over-payments to contractors who engaged in massive bid-rigging – all without the knowledge and/or consent of the Company itself, and Defendants herein.

174.    The chart below indicates the rapid decline in the price of Petrobras ADSs on extraordinarily high trading volume, as the truth about Petrobras bribery and bid-rigging scheme continued to be partially revealed by October 27, 2014 ("Partial Revelation II"), as follows:



### Partial Revelation III: Additional New Details are Revealed by Police Investigations and the Company

175.    On November 17, 2014, according to the *Wall Street Journal,* the widening probe into corruption at Petrobras ensnared another former executive and touched some of the most powerful construction firms in the country. The *Journal* reported that federal police had arrested 18 people, including Renato Duque, former Director of Engineering and Services at Petrobras. Authorities alleged he and others were part of a bribery and money-laundering scheme that siphoned hundreds of millions of dollars from Petrobras into the pockets of employees, contractors and politicians. The construction firms being probed have around $22.6 billion in contracts with Petrobras, according to Igor Romario de Paula, a regional federal police chief.

176.    It was further reported that Brazilian police served dozens of search warrants and raided the offices of eleven companies suspected of participating in the bid-rigging and bribery scam, including Brazilian multinationals: Odebrecht SA; Camargo Correa SA; and Construtora OAS SA. Others were also charged with colluding to inflate the costs of work performed for Petrobras. Among those for whom police have arrest warrants were Dalton dos Santos Avancini, Chief Executive of Camargo Correa's construction unit, Construcoes e Comercio

Camargo Correa SA, and the unit's Vice President, Eduardo Hermelino Leite, and a board member, Joao Ricardo Auler. Police also carried out a search warrant at the house of Marcio Faria, Chief Executive of Odebrecht Engenharia Industrial's industrial-engineering group, but he was not arrested.

177.    Also on November 17, 2014, Defendant Foster admitted that SBM Offshore had bribed Petrobras employees to win contracts, and that the Company had been informed of these bribes and had failed to disclose them. Defendant Foster stated that, due to the "overwhelming evidence of noncompliance," SBM Offshore would no longer be eligible to bid for further contracts with Petrobras. Defendant Foster also stated, "We [were] informed in the past that we had identified no irregularities at this matter. After a few weeks or months, I was informed that ***there were indeed bribes to employees or former employees of Petrobras***." (Emphasis added). This report also quoted Jose Formigli, Petrobras' Head of Exploration and Production, who further stated that Defendant Foster had been contacted by SBM Offshore which informed Petrobras that *it* had engaged in fraud and bribery in association with Petrobras.

178.    On November 17, 2014 shares of the Company dropped from a closing price of $9.95 on October 14, 2014 to a closing price of $9.3, a drop of 6.2% on heavy trading volume.

179.    The chart below indicates the rapid decline in the price of Petrobras ADSs on significantly high trading volume as the truth about Petrobras bribery and bid-rigging scheme continued to be reported to investors. The impact of Partial Revelation III is evidenced below:



180.   Nevertheless, Petrobras's ADSs continued to trade at artificially inflated levels due to the materially false statements and omissions made by the Company during the Relevant Period which had not been corrected. Plaintiff was unaware of key facts regarding the extent of the bribery and corruption at the Company, and the financial impact that the corruption would have on the Company's future prospects.

**Partial Revelation IV: Additional Arrests, Evidence of Senior Management Involvement, and Delay of Petrobras Financial Reporting**

181.   By mid-December, Petrobras was facing international and domestic investigations into its key business areas, its key business partners were alleged to have participated in an illegal scheme and some of these partners were already admitting to have committed illegal activities, and the Company's financials were under great scrutiny by its auditors and the government for overbilling, overstatement of assets, and suspicious transactions that ran into the billions of dollars. Under this uncertainty, it is little surprise that the Company again delayed the filing of its financial statements for the third quarter of 2014 on December 12, 2014, as had been previously announced.

182.    Between December 12, 2015 and December 15, 2015, a series of events revealed new information concerning the extent and breadth of the fraud. On December 12, it was widely reported that Brazilian police filed charges against 35 additional co-conspirators related to the fraud and bribery at the Company. It was further reported that bribes were estimated to total more than $4 billion dollars. On December 12, 2014, allegations of the knowledge of key Petrobras executives were also revealed and detailed in the interview of Former Petrobas employee ("Fonseca") on a popular Brazilian television show as well as numerous news reports on the same. In the interview and news reports, Fonseca detailed her time at the Company and her reports to upper management at Petrobras regarding the fraud that she witnessed in 2008.

183.    Also on December 12, 2014, the *Houston Chronicle* reported that prosecutors investigating Petrobras had filed charges against 35 people, including executives from some of the nation's biggest construction companies. According to this report, authorities allege top officials from Petrobras operated the kickback scheme on contracts worth upward of $4 billion, with money eventually being fed back to the governing Workers' Party among others.

184.    Also on December 12, 2014, the *Associated Press* reported that the Company was informed about the corruption that had then recently surfaced, as early as 2009. The *Associated Press* reported, in part, the following:

**Petrobras told of corruption in 2009**

SAO PAULO (AP) - ***Brazil's state-run oil company was warned five years ago of the kickback scheme*** that has plunged Petrobras into one of the country's worst corruption scandals, a newspaper reported Friday.

The paper, Valor Economico, said it ***obtained documents showing that in 2009, former Petrobras executive Venina Velosa da Fonseca warned chief executive Maria das Gracas Foster about inflated contracts on refinery projects***.

[Emphasis added].

72

In response, Petrobras issued a statement saying it began internal investigations into the information in 2008, and fired Fonseca in 2009 for violating procurement procedures.

185.    On December 12, 2014, after the markets closed, Petrobras announced that it would not file its financial results for 3Q:14 as previously promised. Instead, Petrobras filed a release that stated, in part, the following:

> Petrobras announces that today, in light of new facts that occurred after November 13, 2014, directly or indirectly related to the "*Lava Jato* Operation", it **decided not to file its consolidated interim financial statements for the 3rd quarter 2014** not reviewed by the independent auditors. These facts are set out below:
>
> * * *
>
> (ii)    On November 21, 2014, Petrobras received a subpoena from the U.S. Securities and Exchange Commission (SEC) requesting certain documents relating to an investigation of the Company by the SEC;
>
> * * *
>
> (iv)    On December 9, 2014, the Company was served with a class-action complaint filed [in the U.S. District Court, Southern District of New York];
>
> (v)    On November 11, 2014, criminal charges were filed by the Brazilian Public Prosecutor's Office against several individuals, including the Former Director of Downstream, Paulo Roberto Costa, and managers of other companies for active corruption, passive corruption, organized crime, money-laundering and falsification of documents.

[Emphasis added].

186.    On December 12, 2014, the evidence of corruption presented by Fonseca was also revealed in a widely-publicized television interview and an article on *Valor* and *Valor International*. Fonseca, a former manager at Petrobras, reported that in 2008, she alerted Defendant Foster and other management at Petrobras about irregularities and inflation in contracts signed by the Services division. Fonseca provided emails that she had sent to

Defendant Foster, that detailed not only the conversations that she had in an attempt to address the fraud, but also the retaliation that she suffered for blowing the whistle on the fraud.

187.    After the weekend during which the markets were closed, on December 15, 2014, the scope of the scandal widened further as Brazilian prosecutors announced that charges had been filed against former Petrobras executive Nestor Cervero relaing to $53 million in bribes paid by Samsung Heavy Industries as part of a deal to supply offshore drilling vessels..

188.    Shares of Petrobras ADSs dropped significantly on the news that began leaking out to the public throughout the day and into the evening of December 12, 2014. Petrobras ADSs closed at $7.42 on December 11, 2014, but then dropped 4.2% on December 12, 2014 to $7.11 on heavy trading, and then dropped again on the next trading day, Monday December 15, 2014, to $6.26, another 12%, on very heavy trading volume.

189.    The chart below indicates the continued decline in the price of Petrobras ADSs on significantly high trading volume as the truth about Petrobras bribery and bid-rigging scheme continued to be reported. The impact of Partial Revelation IV is evidenced below:



**VIOLATIONS OF GAAP, SEC & IFRS REPORTING RULES**

190.    During the Relevant Period, Defendants materially misled Plaintiff herein, and the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its asset values and balance sheet, as well as the Company's accounting, reporting and financial condition, in violation of the federal securities laws, IFRS and GAAP.[5]

191.    IFRS and GAAP consist of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.[6]

**Reporting Standards for PP&E under IFRS:**

192.    Under IFRS, "Property, plant and equipment (also variously referred to as plant assets, fixed tangible assets, fixed assets or PP&E) is the term most often used to denote tangible assets to be used in the production or supply of goods or services, for rental to others, or for administrative purposes and that will benefit the entity during more than one accounting period."

---

[5] According to Certifications signed by defendants Foster and Barbassa on 4/30/14 which were also filed as exhibits to the Company's Annual Report filed with the SEC pursuant to Form 20-F, defendants had designed Petrobras' internal control over financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

[6] On July 1, 2009, the various tiers of authoritative guidance constituting U.S. GAAP were recodified as a single authoritative body called the "FASB Accounting Standards Codification" (referred to throughout at "ASC"). The Financial Accounting Standards Board ("FASB") recognizes the ASC as "the single source of authoritative nongovernmental U.S. generally accepted accounting principles (GAAP)." Although the recodification centralized U.S. GAAP in a single body, FASB's overview represent that no substantive changes were made.

*See* <u>Wiley IFRS</u> Ch. 9.3.[7]   Further, "item[s] of property, plant and equipment should be recognized as an asset only if two conditions are met: (1) **it is probable that future economic benefits associated with this item will flow to the entity**; and (2) **the cost of this item can be determined reliably**." *Id*. [emphasis added]

193.   The IFRS's International Accounting Standard ("IAS") 16 states that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "**the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction**." [emphasis added]. Thus, the amount to be capitalized should include: (1) the asset's purchase price, including legal and brokerage fees, import duties, and nonrefundable purchase taxes, after deducting trade discounts and rebates; (2) any directly attributable costs incurred to bring the asset to the location and operating condition as expected by management, including the costs of site preparation, delivery and handling, installation, setup and testing; and (3) estimated costs of dismantling and removing the item and restoring the site.  *See* <u>Wiley IFRS</u> Ch. 9.3.

194.   When a Company violates IFRS by improperly capitalizing bribes and costs in excess of the actual contract values as cash expenditures as PP&E, as Petrobras had done prior to and throughout the Relevant Period, it has two immediate effects.  First, improper capitalization

---

[7] John Wiley & Sons is a known publisher of accounting treatises, such as <u>Wiley IFRS</u> (concerning international financial reporting standards), and <u>Wiley GAAP</u> (concerning United States GAAP).  <u>Wiley IFRS</u> is searchable as a secondary source of authority on LEXIS, and has been cited by courts as persuasive authority in international accounting matters.  *See Ms "taga Bay" Gmbh & Co. Containerschiff KG v. Sa Indep. Liner Servs. Pty,* 2009 U.S. Dist. LEXIS 64639, FN 5 (S.D.N.Y. July 24, 2009).  Similarly, <u>Wiley GAAP</u> has been recognized by various courts as persuasive authority regarding accounting matters and financial statement presentation.  *See In re Sagent Tech., Inc. Sees. Litig.,* 2002 U.S. Dist. LEXIS 29263, *18 (N.D. Cal. Sept. 11, 2002).

of costs artificially inflates asset values on the Company balance sheet, making the Company appear more valuable than it really is.  Second, costs that should have been immediately recorded as expenses do not appear on the corporate income statement.  The latter has the effect of showing artificially low expenses, which increases overall net income. The overall effect shows an overvalued business, purportedly with artificially inflated net income.

195.    In addition to imposing an obligation for properly reporting assets in the first instance, and not to include bribes and illicit over-payments, under IFRS, the Company was also under an obligation to periodically review its assets and ensure their recorded/carrying value on the balance sheet was not materially higher than its recoverable amount.  "If an asset's carrying amount is more than its recoverable amount (the amount to be recovered through use or sale of the asset), an impairment loss is [required to be] recognized. *IAS 36 requires an entity to assess at the end of each reporting period whether there is any indication that an asset may be impaired*."  *See* Wiley IFRS Ch. 13.3. [Emphasis added.]

196.    Notwithstanding the fact that bribes and kickbacks should not be paid at all, the standards provided for above do not allow for the capitalization of bribes and kickbacks as alleged throughout this Complaint, and they should have been immediately expensed.

197.    If Defendants had periodically reviewed Petrobras' PP&E for impairment, as required under IFRS, the Company should have discovered the scheme and taken remedial action as early as 2004, if not before.  By failing to do so, the bribery, illicit contract over-payments, related accounting fraud and its concealment as "fixed assets" continued unabated for years.

### Reporting Standards for PP&E under U.S. GAAP

198.    U.S. GAAP also adopts a cost-based approach to PP&E presentation in a balance sheet.  Effectively, however, there is no difference between GAAP and IFRS when it comes to

prohibiting the recognition of bribes and illicit contract over-payments to Cartel members as assets on a company's balance sheet.

199.    Under U.S. GAAP, historical cost is defined as "The generally accepted method of accounting used in the primary financial statements that is based on measures of historical prices without restatement into units, each of which has the same general purchasing power." *See* ASC 255-10-20.

200.    With respect to fixed assets, "Property, Plant, and Equipment acquired must be accounted for **at historical cost**. When a depreciable asset is acquired in exchange for a monetary asset, the historical cost of the asset includes all the expenditures necessary to bring it to the condition and location of its intended use." *See* 1-10 <u>Applying GAAP and GAAS</u> § 10.04. [Emphasis added]. See also ASC 306-10-30-1, and ASC 360-10-30-2. Allowable activities include the physical construction of the asset, (if applicable), administrative/technical activities during the preconstruction stage, development of plans, and the process of obtaining permits from governmental authorities. It also includes activities undertaken after construction has begun in order to overcome unforeseen obstacles, such as technical problems, labor disputes, or litigation. *See* ASC 360-10-20.  Such costs are capitalized and recorded on the company balance sheet as a fixed asset (*i.e.* tangible property used in a productive capacity that will benefit the reporting entity for a period exceeding a one year).  *See* <u>Wiley GAAP 2015</u> Ch. 25, page 401 (John Wiley & Sons, Inc., 2015).

201.    "Determination and consideration of historical cost depends on the circumstances surrounding the asset's acquisition."  *See* 1-10 <u>Applying GAAP and GAAS</u> § 10.04.

202.    If the entity constructs – rather than purchases – an asset, then all direct costs (*e.g.* labor, materials, payroll, and related benefit costs) of constructing an entity's own tangible fixed

assets are capitalized.  While a portion of indirect costs - a reasonable portion of which are allocable to construction costs – may also be capitalized, general and administrative costs are treated as period costs and expensed in the period in which they are incurred.  Wiley GAAP 2015, Ch. 25, page 406 (John Wiley & Sons, Inc., 2015).

203.    Improper capitalization of costs violates U.S. GAAP, producing the same results discussed in the preceding section.  In the instant matter, Petrobras' improper capitalization of cash expenditures paid as bribes and illicit contract overpayments as PP&E artificially inflated asset values on the Company balance sheet, and failed to record expenses on the corporate income statement.  The overall effect on the Company's financial statements is an overvalued balance sheet, and an income statement showing greater net income than actually existed.

204.    Moreover, similar to IFRS, U.S. GAAP also imposes review obligations on an entity recording PP&E on its balance sheet.  U.S. GAAP defines impairment as "…the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value." *See* ASC 360-10-20.  Further, GAAP requires that impairment losses must be recognized "when the carrying amount of the impaired asset (or asset group) is not recoverable (ASC 360-10-35-17)." *See* Wiley GAAP 2015 Ch. 25, page 416 [citation original].  Thus, when an asset is overvalued it should be "written down."

205.    Under U.S. GAAP, "Impairment under U.S. GAAP is a two-step process. The first step is to compare the undiscounted future cash flows, termed the recoverable amount, of the assets being testing to the carrying value. If the recoverable amount is less than the carrying value, the second step is taken, resulting in a write-down of the excess of the fair value of the asset over the carrying value. Impairments cannot be reversed."  *See* Wiley IFRS Ch. 13.6 (*comparing* U.S. GAAP to IFRS).

79

206.    Notwithstanding the fact that illicit overpayments, bribes and kickbacks should not be paid at all, the standards provided for above do not allow for the capitalization of illicit overpayments, bribes and kickbacks as alleged throughout this Complaint.  Accordingly, all such illegal and improper payments should have been immediately expensed during the period incurred.

207.    If Defendants had periodically reviewed Petrobras' PP&E for impairment, as required under U.S. GAAP, they would have discovered the scheme and would have taken remedial action as early as 2004, if not sooner.  By failing to do so, the bribery, illicit overpayments, related accounting fraud and its concealment as "fixed assets" continued unabated until the corrective revelations were made at the end of the Relevant Period.

208.    Moreover, Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

209.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

210.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's

ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the

MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

211.    The GAAP requirement for recognition of an adequate provision for foreseeable

costs and an associated allowance applies to interim financial statements as required by ASC

270-45-10[8].Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative

pronouncement states, in pertinent part:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

212.    The Company's financial statements contained in the quarterly reports filed with

the SEC on Forms 20-F and 6-K, for the full year 2013 and the quarterly periods in 2014,

---

[8] FASB Accounting Standards Codification 270-45-10 is formerly known as Accounting Principles Board Opinion No. 28, ¶ 17.

respectively, were presented in a manner that violated the principle of fair financial reporting and the following generally accepted accounting principles, among others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions.

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent.

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports.

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial.

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results.

213.    In addition to violating all of the foregoing enumerated principles, during the Relevant Period, Defendants also violated SEC disclosure rules:

(a)    Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Relevant Period materially false and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

214.    Defendants were required to disclose in the Company's financial statements the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with either GAAP or IFRS rules. Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Relevant Period, were materially false and misleading for the reasons set forth herein. Had the truth about the Company been disclosed during the Relevant Period, the price of Petrobras ADS would have traded at prices well below that which they did during that time, and Plaintiff would not have purchased its ADSs at artificially inflated prices.

## ADDITIONAL SCIENTER ALLEGATIONS

**The Scienter of Petrobras is Supported by Strong and Compelling Indicia of a Long-Standing, Pervasive, and Endemic, Fraudulent Scheme in which All Members of the Executive Directorate Participated Along with Additional Co-Conspirators.**

215.    Defendants acted with scienter in that each knew or recklessly disregarded that the public documents and statements issued or disseminated by the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to investors, including Plaintiff herein; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Petrobras, their control over, and/or receipt and/or modification of Petrobras' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Petrobras, participated in, knew of, and/or recklessly disregarded the fraudulent scheme alleged herein.

216.    Defendants were motivated to materially misrepresent to the SEC and Plaintiff the true financial condition of the Company because: (i) it deceived Plaintiff regarding Petrobras' business, asset values, operations, contingent liabilities, management credibility and the intrinsic value of Petrobras ADSs; (ii) it enabled Defendants to artificially inflate the price of Petrobras securities; (iii) enabled Defendants to sell over $8.5 billion of corporate debt securities while in possession of material adverse non-public information about the Company; (iv) caused Plaintiff , through its Assignors, to purchase Petrobras ADS at artificially inflated prices; and (v) it caused Plaintiff harm when the true facts were revealed and the artificial inflation was removed from the price of the ADSs.

217.    In late 2014, Costa, the Company's Chief Downstream Officer and served on Petrobras' Executive Directorate from May 14, 2004 to April 2012, stated in sworn testimony before the Federal Court in Parana, Brazil that he conspired with other Petrobras senior

executives to operate a bribery and bid-rigging scheme. Costa testified that Petrobras rigged bids for outside contractors to artificially inflate costs of the contracts by up to 20% in exchange for Petrobras officials demanding and receiving a standard 3% bribe for themselves and Brazilian political parties that sponsored their appointments to the Executive Directorate.

**The Members of Petrobras' Executive Directorate During the Relevant Period, Including the CEO, Six Senior Officers, and Multiple Division Heads, Knew of or Recklessly Disregarded the Fraudulent Scheme, Supporting a Strong Inference of Petrobras' Scienter and the Scienter of Individual Defendants Barbassa, Foster, Figueiredo, Formigli, Cosenza, Martins, Dutra, and Machado**

218.    Prior to and during the Relevant Period, the Petrobras' Executive Directorate included the CEO and six senior officers of the Company and heads of the Divisions of Finance, Gas and Energy, Downstream, Services, International, and Exploration and Production. All of these Directorate Executives were either key participants in or, at minimum, knew of or recklessly disregarded the bid-rigging scheme and its impact on Petrobras' financial statements.

219.    Defendant Almir Guilherme Barbassa, the Chief Financial Officer from 2005 - 2015, was involved intimately with the fraudulent scheme as discussed in ¶¶287-293. He was also the CFO of the Company during the presidency of Gabrielli, during which time massive bribery was committed as evidenced by the testimony of Costa, Youssef, and Barusco.

220.    Defendant Figueiredo, the Chief Engineering, Technology & Procurement Officer was the right hand man of Pedro Barusco (who has already admitted to accepting $97 million in bribes). The two worked closely together when Defendant Figueiredo was executive manager of Exploration and Production and Barusco as the managing director in the Engineering division, prior to 2012. Defendant Figueiredo replaced Duque in May 2012, after Defendant Foster was appointed CEO. Defendant Figueiredo was listed in the letter by a former SBM employee who accepted bribes from Petrobras. Specifically, the letter by the SBM agent stated that representatives of Petrobras held a meeting with Defendant Figueiredo to offer SBM a contract

for the rental of marine equipment without any bidding. Furthermore, all contracts for the ship chartering fell under Defendant Figueiredo's jurisdiction, and he held great influence. Any contracts for these services, including the ones at the center of the bribery involving SBM Offshore, went through Defendant Figueiredo.

221.    Defendant Formigli, the Chief Exploration and Production Officer, was tied to the SBM Offshore bribery by emails uncovered during the Dutch investigation. Defendant Formigli's name was found on a list of Petrobras employees who had contact with SBM's agent in Brazil who engaged in the bribery scheme. These Petrobras employees provided information to SBM's agent or were influential within Petrobras. Also on the list of names was Renato Duque, who has been arrested for his role in the bribery scandal.

222.    Defendant Cosenza, the Chief Downstream Officer, replaced Costa when Defendant Foster took charge of Petrobras. Before being appointed, he had been a career employee at Petrobras and had become close partners with Costa prior to replacing him. According to Federal Police investigators, Costa and Youssef have stated that Defendant Cosenza received bribes or "commissions" from the contracts entered into by Petrobras under his watch.

223.    Defendant Martins, the Chief Gas and Power Officer, was the closest to Graca during her time in charge, as he had previously worked with her when she was chief of the Gas and Power division. Santoro regularly recommended and approved contracts for additional costs for gas and power works that were at the center of the scandal, including the Urucu-Manaus gas pipeline. That project was originally budgeted at R$1.2 billion but ended up costing more than R$4.48 billion after cost overruns. Santoro also approved a $434 million dollar payment relating to the Bolivia pipeline project despite the objection of the technical team of Petrobras. That

Bolivia pipeline project and, specifically, the $434 million payment approved by Martins, are now under investigation for fraud by the TCU.

224.    Defendant Dutra has been the Chief Corporate and Services Officer since 2012, though he has taken a medical leave of absence from the Company since February 27, 2015, shortly after the other members of the  Executive Directorate resigned. Defendant Dutra was also President of Petrobras from 2004 – 2007 and, after a failed run to become elected Senator, he was also president of the PT from 2010 – 2012. Defendant Dutra was tied to the SBM Offshore bribery by emails uncovered during the Dutch investigation. Defendant Dutra's name was found on a list of Petrobras employees who had contact with SBM's agent in Brazil who engaged in the bribery scheme. These Petrobras employees provided information to SBM's agent or were influential within Petrobras.

225.    Defendant Foster was the CEO during the Relevant Period. Detailed allegations regarding Foster are set forth at ¶¶ 269-286 below.  The fraud and inflation of construction contracts was brought to the attention of Foster prior to her appointment as CEO by at least two whistleblowers. Foster issued numerous statements during and prior to the Relevant Period attesting to a "zero tolerance" policy to fraud and corruption in the Company's activities and businesses. Foster is now under investigation by the Brazilian Prosecutors Office in the Federal District and the Public Prosecutor at the Federal Audit Court called for not testifying truthfully to the Brazilian Congress.

### Previous Members of the Executive Directorate and Others with Close Ties to It Have Been Indicted and/or Pleaded Guilty in Connection with the Fraudulent Scheme, Supporting a Strong Inference of Petrobras' Scienter

226.    Previous members of the Executive Directorate and other individual with close ties to the Executive Directorate have pled guilty or been indicted in connection with the scandal, including the following.

227.    Costa was Director of Downstream/Supply and a member of Petrobras' Executive Directorate from May 14, 2004 to April 2012. Costa was arrested in 2014, indicted, and pled guilty to bribery and corruption in connection with Operation Car Wash. As noted in an October 21, 2014 *Bloomberg* article, during his tenure at Petrobras, Costa was the Company's "public face." He has admitted to his role in the scheme and to his personal receipt of millions in bribes. His testimony details an elaborate scheme involving the systematic inclusion of a 3% bribe in every contract with the Cartel companies as well as the involvement and knowledge of the members of the Directorate.

228.    Duque was Chief Services Officer and member of Petrobras' Executive Directorate from 2003 until April 2012. He was arrested and indicted in connection with Operation Car Wash on March 16, 2015.  According to official documents, the Senate has issued a notice requiring Dutra to appear before the Commission to testify. The Commission is interested in Dutra because of the testimony by Costa, who stated that the scandal dated back to the time Dutra was president of Petrobras. Specifically, Costa stated, in response to a series of questions regarding whether the  Executive Directorate of Petrobras knew of the Cartelization, and whether they participated in the process and benefited from the undue advantages: "[w]hen I began working at Petrobras, in 2004, [the president] was Jose Eduardo Dutra… He knew, as did, later President Gabrielli, he knew too. There wasn't any lack of awareness [of the Cartelization] by them."

229.    Cervero, who was the former director of Petrobras' international division, was indicted in December 2014 in connection with Operation Car Wash, and following a trial, he was convicted and sentenced to five years in jail on May 26, 2015.

230.    Barusco, a former executive at the Petrobras services department, was charged on March 16, 2015 and has pled guilty to bribery and corruption. Barusco admitted to his involvement in the scheme, has admitted to the endemic and pervasive nature of the scheme, and has agreed to return over $100 million that he personally received from illegal bribes in connection with the scheme. In his plea agreement, he admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization crimes, among others, involving the Company Petroleo Brasileiro S/A."

### Non-Petrobras Employees Who Engaged in the Scheme Have Described it and Petrobras Involvement in Detail, Supporting a Strong Inference of Scienter as to Petrobras

231.    In addition, numerous non-Petrobras employees who engaged in the fraudulent scheme have admitted to the widespread wrongdoing.

- Youssef, a convicted money launderer, admitted to personally delivering cash payments to Petrobras executives and others.

- Augusto Ribeiro de Mendonça Neto ("Mendonça Neto") , a director of Toyo Setal, an EPC contractor in Brazil and member of the Cartel, also provided information regarding the scheme.

- Julio Camargo, another Toyo-Setal executive, testified that he paid R$12 million (approx. US$5.1 million) in bribes to Costa and Duque to build a major component at the Repar refinery.

- Erton Medeiros da Fonseca ("Fonseca"), the CEO of Galvão Engenharia, a leading Brazilian construction company, provided Brazilian prosecutors with receipts of bribes paid to Duque.  According to Fonseca, Galvão consistently outbid its competitors on projects, but it wasn't until Galvão began paying bribes to Petrobras that Galvão won any contracts. Fonseca, through his attorney, stated that "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by [José] Janene," a money launderer who facilitated bribes to Petrobras executives. Janene told Fonseca at a meeting at Fonseca's home in 2010 "in a very truculent way . . . that ***to be able to win contracts, he would have to pay***." The contracts Galvão won with bribery money included

projects as large as R$2 billion to R$3 billion (approx. US$1.1 billion to US$1.7 billion), such as construction contracts at Abreu.

**All Members of the Executive Directorate Were Involved in Review and Approval Virtually Every Contract Entered into by the Company for the Duration of the Scheme, Supporting a Strong Inference of Corporate Scienter During the Relevant Period**

232.     The members of the Executive Directorate reviewed and approved nearly every single contract entered into by Petrobras that had been obtained and artificially inflated as part of the bribery and bid-rigging scheme. As stated by Defendant Foster in a February 6, 2013 Form 6-K, the Executive Directorate met "twice weekly to focus on the physical and financial monitoring of the principal projects in [Petrobras'] investment plan." The members of the Directorate were actively and directly involved in the preparation of materially false and misleading financial statements during the Relevant Period. The Audit Board is mandated by Company by-laws to "analyze, at least quarterly, the interim balance-sheet and further financial statements periodically prepared by the Board of Executive Officers."

**The Testimony and Guilty Pleas of Costa, Youssef, and Barusco Support a Strong Inference of Petrobras' Corporate Scienter**

233.     To date, multiple Petrobras executives and other participants in the scheme have pleaded guilty to corruption and bribery and have provided sworn testimony and documentation regarding the scheme to Brazilian investigators. Costa and Barusco have provided testimony showing the involvement of Duque and other executives' involvement in the scheme.   In addition, Youssef, a convicted money launderer, admitted to personally delivering cash payments to Petrobras' executives and others.

234.     The testimony and guilty pleas of Costa and Barusco before the Federal Court in Parana, Brazil in November and December 2014, as well as their testimony before the Brazilian Congress in March 2015, support a strong inference of corporate scienter as to Petrobras. Their

testimony reveals that the fraud at the Company was "endemic" and institutionalized," involved senior executives at Petrobras and was perpetrated in part to obtain business from the Cartel and curry favor of politicians at whose discretion these key executives served. The December 11 Prosecutor's Complaint states that the fraud was clear to all members of the Directorate as every contract with Cartel members was "close to the maximum (ceiling) estimated by [Petrobras], and sometimes they even exceeded that." Regardless of these constant and recurrent red flags demonstrating that the contracts consistently exceeded the Company's estimates by up to 20%, the fraud continued unabated prior to and throughout the Relevant Period.

235.    The Company's construction contracts were materially overstated prior to and throughout the Relevant Period and Petrobras and all members of the Directorate, including Defendants Foster and Barbassa, knew or recklessly disregarded that the Company's capitalization of these costs caused its financial statements – including its PP&E, assets, and net income – to be material overstated.

236.    According to the December 11 Prosecutor's Complaint, Costa worked with Duque, Barusco and other "top level civil servants at Petrobras" to "rig[] the competitive bidding processes regarding the major works contracted by PETROBRAS between 2004 and 2014, largely increasing the profits of those companies in [the amount of] hundreds of millions [reais.]" Those amounts were reported falsely as assets instead of expenses on Petrobras' financial statements, rendering them materially false and misleading when made

237.    In Costa's sealed plea agreement with Brazilian prosecutors from April 2014 -- which was publicly addressed in a September 6, 2014,  news report by *Agence France Presse*, which the Company promptly denied on September 8, 2014 in a 6-K -- Costa admits that the scheme "had the support of Petrobras directors and equivalent civil servants" including Costa

and Duque, "who made sure the intent of the criminal group was attained." Costa further admitted he knew Petrobras built approximately 3% into every single contract with the Cartel companies to be paid out as bribes to Petrobras officers and directors and, eventually, politicians.

| | |
|---|---|
| Judge: | So the 3 per cent on top of this price was distributed to politicians, is that right? |
| Costa: | Exactly. |
| Judge: | But to whom, how was the distribution settled on, was that something done before you got there or did it come about during your time? |
| Costa: | Possibly it may have happened before I arrived. Because these companies had been working for Petrobras for a long time. And as I said before, the nomination of directors at Petrobras for as long as I am aware was always political. In my area, the first two years, 2004 and 2005, we hardly had any works, they were very small because we didn't have the budget or the projects. When we began to have projects for much bigger works, especially to begin with in the area of refined products like gasoline and diesel, when we had big projects in all the big refineries for that end, it was made clear to me by the companies and by the party that of this average of 3 per cent, 1 per cent would be given to the PP. And the other 2 per cent would go to the PT, inside the directorate that carried out this kind of service, which was the directorate of services. This was made absolutely clear to me. |

238.     Costa admitted to personally signing many of the fraudulently inflated contracts and to direct involvement in the overpricing of contracts and payment of bribes. Costa further explained how every division of Petrobras was involved in the taking and dissemination of the bribes, and explained how, for example Foster's Gas and Energy Division funneled bribes directly to the Labor Party. Costa admitted in his testimony and plea agreement to personally receiving tens of millions of dollars in bribes in connection with the scheme including receiving payments "in cash, normally at my home or the shopping mall or in the office after I opened my consulting company" which payments were delivered by "Normally Alberto Youssef or Janene."

He further testified to Brazilian prosecutors that he worked with Youssef, former federal deputy Jose Janene, and presidents and/or directors of construction companies to execute the scheme.

239.   Costa admitted in addition to the 3% bribe paid on each contract to Petrobras executives and politicians, he knew the Cartel was rigging bid that secretly inflated the Company's contract costs and that as a result of a "prior agreement between the [contractors]… cartelization, obviously, results in an excessive delta price." He also admitted to keeping a daybook detailing payments to politicians, and that acts in furtherance of the scheme occurred in the U.S., including in connection with a refinery in Pasadena, U.S. Costa has agreed to repay approximately $27 million in bribes.

240.   With regard to Barusco, in his plea deal with Brazilian prosecutors on November 20, 2014,  he admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization crimes, among others, involving the company Petroleo Brasileiro S/A," and agreed to "giv[e] back nearly everything of what he improperly received as a result from bribes."

241.   Significantly, as noted above, Barusco stated in a November 20, 2014 "Term of Cooperation" that "the payment of bribes within PETROBRAS was something 'endemic and institutionalized; that when [Barusco] became Executive Manager of the [Services] Department, the payment of bribes by the construction companies already existed and he understood that it was 'a part of the relation.'" Barusco admitted he knew Cartel members were rigging the bids submitted to Petrobras and the price proposals were always "signed near the maximum amount of the internal budget for Petrobras," and "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company." Barusco provided an example in connection with Abreu refinery where a director of Odebrecht "presented a list… containing the

list of companies that should be invited to bid on the biggest packages of the works in RNEST."
Barusco notes that there was "organized pressure" to "close the values of the [RNEST] contracts
at the top echelon of the PETROBRAS budget."

242.    As noted by Barusco, the bribery increased in size and scope as the Company
grew. He admitted "the payment of bribes and their amounts intensified" due to "the increase of
the billing of Petrobras, the increase of prices that were charged by the [Cartel] companies and
the high demand of the company." For example, in 2003, "the [Services] Department managed
and made around US$3B per year and, when [Barusco] left the Company in 2011, around
US$3B per month was being invested." Thus, the bribes increased "proportional[ly]" and there
was a direct correlation between the Company's increased capital expenditure and new projected
and increased bribes to Petrobras executives and politicians. Barusco admitted to receiving $97
million in bribes from over "60 (sixty) contracts signed between companies or consortia of
companies and PETROBRAS." He estimated that Duque, for whom he collected bribes, received
a higher percentage of the bribes, about $140 million, in exchange for the Company's seal of
approval on the contracts. Finally, as reported in the Wall Street Journal, Barusco testified at a
congressional hearing in Brazil on March 10, 2015 that he personally received bribes going back
to 1997 and the scheme expanded and became "more widespread and institutionalized by 2003
or 2004" and continued to grow and expand after that until the true facts were revealed.

243.    The Company's scienter is strongly supported by the two guilty pleas by Costa
and Barusco, as well as the charges levied against three other executives – Gabrielli the former
CEO and two other former members of the Directorate, Duque and Cervero.

244.    Cervero was indicted on February 20, 2015, and accused of requesting $40
million in bribes from Samsung Heavy Industries Co. in exchange for awarding Samsung

contracts to Petrobras, among other bribes. In his testimony before a federal judge, Costa confirmed Cervero's and Duque's involvement in the scheme, testifying that both men personally received bribes in connection with the execution of contracts.

245.    In addition, a February 25, 2015 article in *Veja*, a Brazilian publication, further shows the pervasive nature of the scheme within Petrobras and that Gabrielli's role in the scheme has been confirmed by other co-conspirators. In that article, Ricardo Pessoa ("Pessoa"), the jailed president of accused Cartel member UTC discusses the endemic and institutionalized practice of systematic and consistent bribery and contract inflation at the Company. Pessoa noted that the scheme dated back to 2003 after President Lula came to power and government representatives contacted contractors to explain new rules. Pessoa notes that the ex-president of Petrobras, Jose Sergio Gabrielli, "knew about it all" and that the bribes financed 30 million reais towards the 2014 presidential campaign of Dilma Rousseff and numerous others.

**The Company's Admissions and Actions Against Its Own Executives Support a Strong Inference of Corporate Scienter**

246.    On October 19, 2014, the *Dow Jones* news service reported that Brazil's President, Dilma Rousseff, the former CEO of Petrobras, admitted that wrongdoing existed within the Company. *Dow Jones* reported the following:

HEADLINE: *****Brazil's Rousseff Admits There Was Wrongdoing At** Petrobras

*Brazil's President Recognizes Alleged Embezzlement For The First Time*

*Brazil's Rousseff Admits Wrongdoing at Petrobras*

BRASILIA--Brazil's President Dilma *Rousseff said Saturday that there was embezzlement at government-controlled oil producer Petróleo Brasileiro SA.*

The company, known as Petrobras, has been at the center of a corruption scandal allegedly involving people connected to Mr. Rousseff's Workers Party, or PT.

*"I will do all I can to reimburse the country," Ms. Rousseff said* during a news conference at the presidential residence late in the afternoon. *"There was"*

*deviation of public money, she said according to a transcript of the interview published on her official campaign website.*

\*\*\*

According to local media reports, ***top executives at the company have for years taken bribes to direct multimillion contracts to specific contractors***. Part of the alleged ***kickbacks were allegedly siphoned to politicians of the PT and other parties that support the government***.

Petrobras has said it is cooperating with authorities in the investigations. ***Ms. Rousseff and the PT have repeatedly said that the accusations against Petrobras are baseless and that her administration never condoned corruption.***

[Emphasis added].

247.    As noted above, on October 27, 2014, Petrobras published a release signed by Defendant Barbassa, that acknowledged "Internal steps taken by Petrobras" in response to *Lava Jato,* including that  "**investigations are underway on the practice of alleged crimes committed <u>against</u> Petrobras**."  [Emphasis added].

248.    The Company's October 27, 2014 release admitted that Petrobras had ***already begun working to recover any "deviated resources" and of the amounts "lost through the overprice of the companies that are supposedly part of the cartel*,**" as mentioned by former Director Paulo Roberto Costa during his congressional hearing. (Emphasis added).

249.    The Company has confirmed that the fraud was as widespread as explained by the testimony of the conspirators. In January 2015, Petrobras confirmed that over ***R\$188 billion (US\$73 billion)*** in assets—"or 1/3 of the [C]ompany's total fixed assets"—relate to contracts entered into with Cartel members between 2004 and April 2012 alone. This illegal coordination among Cartel members removed all competition from Petrobras bids, causing bids to skyrocket. In January 2015, Petrobras did not record an asset write-down in connection with its wrongdoing, though the Company acknowledged that an internal review indicated that a write-

down would potentially reach as high as $34 billion. The magnitude and scope of the scheme strongly supports the Company's scienter.

250.    The scandal has demanded the Company take severe action against its executives. On February 4, 2015, Defendant Foster, Defendant Barbassa and four other executives were forced out of the Company, essentially removing every executive on the Executive Directorate board.

251.    The full impact of this massive fraud on Petrobras' financial statements is still under investigation, but the Company's restatement on April 22, 2015, reporting the financial results for 3Q:14, reported a $14.7 billion write-down on impaired assets, including $2.1 billion in losses, relating to the kickback scheme since 2004.

**Retaliation Against Whistleblowers Supports a Strong Inference of Scienter Against Petrobras and Foster**

252.    The Company's and Fosters scienter is further strongly supported by Petrobras' retaliation against numerous whistleblowers.

253.    As discussed in a December 12, 2014 article in *Valor International*, Petrobras executive manager named Fonseca warned repeatedly that Petrobras' coffers were being pillaged. Fonseca, who joined the Company as a geologist in 1990, held several positions of authority throughout her long tenure and eventually reported to Costa and worked with Foster prior to his taking the helm as CEO in 2012. Fonseca specifically and relentlessly relayed concerns and warnings regarding problems with bidding relating to the construction of the Abreu refinery.

254.    After months of raising repeated objections, Fonseca began to receive anonymous threats to herself and her family. Fonseca remained undeterred. In 2011, Petrobras abruptly removed Fonseca from her position and transferred her to the Company's office in Singapore,

where she was instructed to focus on a training course. Fonseca conveyed her outrage at the Company's practices and her sudden and unexpected transfer directly to Foster, through an October 7, 2011 email that became public in connection with the Valor article. Fonseca informed Foster that, as result of the widespread improper practices at Petrobras, "[f]rom the immense pride that I had for my company, I started to feel ashamed." In the email, published in the Valor article, Fonseca told Foster that she was considering what she should do and explicitly noted that part of the incriminating documentation that she had about irregularities was already in Foster's possession: "***Part of it, I know you are already aware of.*** I would like to hear from you before taking the next step." No response was forthcoming from Foster.

255.    Rather than acting on this alarming information, in late 2014, Petrobras, Foster, Barbassa and the other Defendants retaliated against Fonseca and terminated Fonseca's employment without explanation to ensure Defendants could continue their fraudulent scheme. Fonseca responded with an email to Foster:

> Since 2008 my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit].  By fighting it, I was threatened and harassed.
>
>                     *      *      *
>
> I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting. ***I presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain***.

[Emphasis added]

### Supply Division Attorney Fernando de Castro Sá Was Warned and then Transferred After Reporting Problems at Petrobras

256.    Fernando de Castro Sá ("Castro") has testified multiple times, including on January 7, 2015 before federal prosecutors in Curitiba, regarding his observations while working in Petrobras' Supply Division as an attorney. He regularly worked with Paulo Roberto Costa and

Renato Duque and reported the irregularities that he witnessed in the contract procurement process to him. Castro prepared a report in 2009 that covered the problems that he had been witnessing since 2005. For his diligence and reporting, Petrobras first warned him, and then transferred him from his position in order to keep him quiet.

257.   Castro testified that he witnessed numerous irregularities in the contract-procurement process. Namely, the manual for contract procurement, which governed how Petrobras was obligated to abide by, was routinely ignored and disrespected by the directorate of the Company. Instead, the Company would simply seek out input and approval from the cartel members. At one point, Castro openly asked in an internal Petrobras document: "Are the Petrobras lawyers working for Petrobras or for the Cartel?" Shortly after that, Castro says that he was warned to not raise such issues by his superiors.

258.   Castro stated that he witnessed a wide range of other irregularities including payment for work that was never performed. He stated that he witnessed these practices at projects in the Northeast area of Brazil, including the Abreu refinery, and at the Reduc Refinery in Rio de Janeiro.

259.   Castro warned his supervisor of the irregularities in his 2009 report and was shortly thereafter transferred to a new position, with reduced pay, without any work, and in an office without a desk or a computer. He described it as being in a cage. He further stated that he was accused of causing problems.

### Independent Director and Strong Critic of Petrobras Mauro Cunha Was Removed From Audit Committee without Cause

260.   As evidenced by the treatment of Castro and Fonseca, Petrobras routinely made active efforts to ensure that Company insiders who were critical of Petrobras' practices were terminated or shifted from positions where they could continue to uncover the true facts

regarding Petrobras' far-reaching fraudulent conduct. Even within the Relevant Period, Petrobras made such efforts in connection with one of the three independent directors on the Company's board, Mauro Cunha ("Cunha"). Since 2013, Cunha has represented minority investors and has been a strong critic of pro-government policies of Petrobras.  Cunha served on the Audit Committee in early 2014. That committee investigated the Company's actions in acquiring the Pasadena refinery and constructing the Abreu and Comperj refineries.

261.    As reported in a March 18, 2014 *Dow Jones* article titled "Board Member of Brazil's Petrobras Voted Against 2013 Financial Report," during a February 25, 2014 meeting of the Board, Cunha rejected the Company's 2013 earnings reports because "he didn't have enough time to analyze the firm's finances and [] there was insufficient information and 'apparently inadequate' accounting of the firm's investments in refineries."

262.    A February 6, 2015 *Bloomberg* article reports that Cunha complained about Petrobras' conduct to the CVM, Brazil's securities regulatory agency. Specifically, Cunha sent a letter to the CMV following the February 25, 2014 meeting, stating: "They [Abreu and Comperj] are among the world's most expensive refineries . .. . I'm not comfortable with the absence of impairment."

263.    The Board removed Cunha from the Audit Committee without providing any reason during an April 25, 2014 meeting. As reported in an October 20, 2014 *Bloomberg* article titled "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," Cunha lodged a complaint with the CVM raising questions regarding his abrupt termination and the independence of the Petrobras Audit Committee.  Petrobras responded in kind by filing a complaint with the CVM against Cunha regarding statements Cunha made in his capacity as Head of the Brazilian Association of Capital Markets incriminating Petrobras' management team.

**The Company's Bribery of Governmental Officials to Cover Up the Fraud Further Evidence Scienter on behalf of the Company**

264.   Petrobras' intricate and pervasive scheme required extensive efforts from Petrobras' executives and board members to conceal the elaborate system of bribery and bid-rigging. As questions arose, people were either removed from their positions or paid handsomely to remain quiet.

265.   On May 15 2009, a Parliamentary Inquiry Commission (or CPI) was initiated by the Brazilian Senate to investigate charges of fraud, corruption, tax evasion and over-invoicing by Petrobras.

266.   In an effort to refute any allegations or findings of malfeasance, the Company launched a new public relations campaign in the form of a "Fact and Data" section on its website, where it could present information and arguments in response to any news revealed about the Company. For instance, Petrobras categorically denied any impropriety in a July 22, 2009 post, stating:  "There are no problems with Petrobras contracts. There is no overbilling. There are only some divergences between the technical criteria used by the company and the para-meters employed by the Federal Court of Auditors."

267.   In December 2009, the CPI delivered its final report which resolved the Company of any wrongdoing. The final report, concluded that Petrobras "did not commit any irregularities", and instead attacked the findings of the TCU by suggesting that the TCU's findings of irregularities at a Petrobras plant were inconsistent.

268.   It was only recently that revelations came to light, through the testimony of Costa, that the investigation by the CPI had been compromised by Petrobras's bribing of a key politician, Sergio Guerra. According to Costa, Guerra received $4 million in bribes to give up

and put an end to the investigation. Costa also testified that the bribes were approved by the president of Petrobras at the time, Gabrielli.

### **Additional Strong and Compelling Indicia of Foster's Scienter**

269.    Defendant Foster was CEO and Chief International Officer as well as a member of the Board of Directors of Petrobras from February 2012 until her forced resignation in February 2015. Defendant Foster also served as Petrobras' Chief Gas and Power Officer from September 2007 through January 2012, before being appointed Chief Executive Officer in February 2012. During Foster's time both as the CEO of Petrobras and also as Director of the G&P division, Foster was a member of the Executive Directorate of the Company. Defendant Foster was forced to resign from her positions on or about February 4, 2015 due to the fraud that took place at the Company under her watch.

270.    The fraud and inflation of construction contracts was brought to the attention of Foster prior to her appointment as CEO.  Defendant Foster not only turned a blind eye to the fraud, but she retaliated against the whistleblowers who tried to warn her of the corrupt practices and cause them to cease. Defendant Foster was notified by at least two whistleblowers of fraud on major Petrobras projects but took no corrective actions whatsoever and instead blatantly retaliated against the whistleblowers.

271.    In 2009, former Petrobras executive Fonseca warned Defendant Foster about inflated contracts on refinery projects. In emails published by various news organizations, Fonseca stated that she had "presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain".

272.    Additionally, Fonseca informed Foster of the issue and stated that she was considering what she should do about inflated contracts and explicitly noted that part of the incriminating documentation that she had about irregularities was already in Foster's possession:

"Part of it, I know you are already aware of. I would like to hear from you before taking the next step."  Fonseca finished the email with a plea for advice and assistance from Foster, stating: "I would like to hear from you before taking the next step. I don't want to send you anything without a positive sign from you."

273.    Instead of investigating or otherwise addressing the issue of inflated contracts raised by Fonseca, Defendants, including Foster and Petrobras, attempted to marginalize and isolate Fonseca so they could continue the fraudulent scheme that the Company and numerous Petrobras executive were benefitting from. Fonseca was removed from her position and transferred to the Company's Singapore office where she was put in training courses instead of being allowed to work on substantive projects. Moreover, Fonseca reported that she was threatened and harassed because of her attempts to report to Foster on the corruption running rampant at the Company.

274.    Irregularities in another major project were brought to the attention of Company executives, including Defendant Foster, by Gesio Rangel de Andrade, an engineer who worked at Petrobras. In 2006, Rangel was the general manger for the Manaus-Urucu pipeline project in the Amazon rainforest. The project was projected to be a 1.2 billion reais undertaking according to the Company's internal budget department. However, before the work on the project had even started, the project was contracted for 2.4 billion reais after Renato Duque and contractors in the Cartel negotiated and agreed to inflated costs for the project.

275.    Rangel opposed the inflated costs and informed his superiors, including Foster, of the issues. However, the Company pressured Rangel to approve of the costs and when he did not agree to do so, he was removed from his position on the project and moved to a new job with less pay.

276. The statements from former Petrobras employees further evidence that Defendant Foster and other senior Petrobras executives knew or had access to facts regarding the bribery scheme, and knew or recklessly disregarded that the Company was improperly capitalizing project costs that materially overstated the Company's financial statements.

277. As stated by Defendant Foster in a February 6, 2013 Form 6-K, the Executive Directorate met "twice weekly to focus on the physical and financial monitoring of the principal projects in [Petrobras'] investment plan." As it has now become clear, the bribery and fraud scandal was institutionalized at the Company and affected many of the Company's biggest infrastructure projects. Moreover, Defendant Foster and the other members of the Directorate were actively and directly involved in the preparation of materially false and misleading financial statements during the Relevant Period.

278. Throughout the Relevant Period, Defendant Foster signed and/or certified many of the Company's SEC Filings, and signed the Registration Statement filed in connection with the sale of over $8.5 billion of corporate debt. Defendant Foster also signed the Company's Annual Report, filed April 30, 2014 pursuant to Form 20-F. The Annual Report included a section refuting recent claims of bribery and fraud at the Company, stating: "On March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

279. The 2013 Form 20-F also contained Certifications, signed by Defendants Foster and Barbassa, that again purported to attest to the completeness and accuracy of the financial statements contained in the 2013 Form 20-F, and to its compliance with GAAP.

280.    Defendant Foster also stated in the Company's Corruption Prevention Program Manual that, at all relevant times, Petrobras maintained a "zero tolerance" policy to fraud and corruption in the Company's activities and businesses.

281.    The Company's 1Q:14 Form 6-K, filed with the SEC on May 12, 2014, contained a statement by Foster in the "Comments from the CEO" section, which quoted Defendant Foster, in part, as follows:

> I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program. All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.

282.    These above statements, as well as the other statements detailed *supra* made by Defendant Foster, were materially false and misleading when made despite Defendant Foster being aware or recklessly disregarding facts that fraud and bribery were happening at the Company. Defendant Foster, due to her role on the Executive Directorate was under the duty to monitor the Company's projects on a regular basis with the other members of the Executive Directorate.

283.    The testimony of Costa explains in detail how every division of Petrobras was involved in the taking and dissemination of the bribes, and explained how, for example Defendant Foster's Gas and Energy Division funneled bribes directly to the Labor Party.  In other words, Defendant Foster owed her job to the political parties and politicians who received bribes from the Company. Costa stated in his testimony that:

> Costa:          At Petrobras, for as long as I have known it, the directors and the president of the company have always been political appointments. The directors of Petrobras, whether in the Sarney government, or Collor, or Itamar Franco, or in the government of Fernando Henrique or in the government of President Lula, were always

political appointments. I was indeed nominated by the PP for the
area of supply.

Judge:          And specifically by deputy José Janene?

Costa:          By the party; at the time he was the leader of the party and he was
influential in my nomination.

Judge:          Did you have a prior relationship with him?

Costa:          No, I didn't know him. I got to know him when there was this
possibility of being appointed to the board by the party and got to
know him and other members of the party from that moment, I
didn't know him before.

Judge:          The fact of your being nominated by this political grouping and the
influence of deputy José Janene in your nomination, was this
known of generally inside the company?

Costa:          Yes. At the level of senior management, yes.

Judge:          And of the other directors and president of Petrobras?

Costa:          Yes. That's correct. Just as I knew that the other directors had been
nominated and who had nominated them.

                            *        *        *

Costa:          And as I said before, the nomination of directors at Petrobras for as
long as I am aware was always political. In my area, the first two
years, 2004 and 2005, we hardly had any works, they were very
small because we didn't have the budget or the projects. When we
began to have projects for much bigger works, especially to begin
with in the area of refined products like gasoline and diesel, when
we had big projects in all the big refineries for that end, it was
made clear to me by the companies and by the party that of this
average of 3 per cent, 1 per cent would be given to the PP. And the
other 2 per cent would go to the PT, inside the directorate that
carried out this kind of service, which was the directorate of
services. This was made absolutely clear to me.

284.    On November 17, 2014, an Agencia Brasil article confirmed the bribery by SBM

Offshore as Defendant Foster admitted that SBM Offshore had bribed Petrobras employees to

win contracts, and that the Company had been informed of these bribes and had failed to disclose them.

285.    On November 20, 2014, the Brazilian Prosecutors Office in the Federal District and the Public Prosecutor at the Federal Audit Court called for the immediate dismissal of Defendant Foster as CEO of the Company, and to establish a criminal inquiry into this matter. The request stated that Defendant Foster did not testify truthfully before congress on June 11, 2014, at the *Comissao Parlamentar de Inquerito*. Specifically, the request stated that Defendant Foster lied when she stated that Petrobras did not receive any warning from Netherland's authorities concerning bribery payments by SBM Offshore to Petrobras.  Additionally, as information about isolated instances of overbilling at the Pasadena refinery first began to leak out in August 2014, the TCU began investigating Foster's role in potential bribery relating to the project with the option of freezing Defendant Foster's assets if it suspected her involvement. Brazilian media reported that, as early as on August 20, 2014 (before the first of several corrective revelations and disclosures were made) that, in response to the TCU investigation, Defendant Foster transferred the ownership of numerous pieces of property, including luxury apartments in Rio de Janeiro, to family members.

286.    These facts support a strong inference that Foster was aware of, or at minimum recklessly disregarded, the corruption, bribery, and fraud at Petrobras during the Relevant Period.

## The Scienter of Defendant Barbassa is Supported by Strong and Compelling Evidence

287.    Defendant Barbassa was CEO and Investor Relations Officer of the Company during the Relevant Period. As part of his duties as CFO, he was a member of the Company's Executive Directorate. Defendant Barbassa was also a key figure in participating in meetings and conference calls with investors and analysts, during which he provided details on the Company's

financials and their anti-corruption policies. Defendant Barbassa was forced to resign from his position as CFO due to the fraud and bribery scandal on February 4, 2015, after serving since 2005.

288.    As CFO and as a member of the Executive Directorate, Defendant Barbassa was entrusted and obligated with reviewing the financials on all important projects at the Company, many of which were substantially inflated by bribes. Moreover, as CFO, Defendant Barbassa's position was dependent on support of politicians who appointed the members of the Executive Directorate. As detailed in the testimony of Costa, these politicians appointed executives who could be relied upon to continue the lucrative bribery system. In late August and early September, Costa testified to the political patronage system in his testimony before the Federal Triubunal in Parana:

> Costa:    ***[I]n relation to the directorate of services, everyone knew that part of these contracts in the supply area, of the 3 per cent, 2 per cent was for the PT, from the services directorate***. Other directorates such as gas and energy, such as exploration and production, also were from the PT. So there was PT in the directorate of exploration and production, PT in the directorate of gas and energy, and PT in the services area. ***What you used to hear in the company was that in these cases, the 3 per cent went directly to the PT***. There was no participation of the PP because these directors were nominated by the PT. ***So it was known in the company that this money went entirely to the PT.*** The international directorate was nominated by the PMDB, so that money was passed on to the PMDB.

[Emphasis added.]

289.    The Executive Directorate is composed of the Company's CEO and six senior executive at the Company. The Executive Directorate met "twice weekly to focus on the physical and financial monitoring of the principal projects in [Petrobras'] investment plan."

290.    During the Relevant Period, Defendant Barbassa signed and/or certified the Company's SEC Filings, and signed the Registration Statement filed in connection with the sale of over $8.5 billion of corporate debt. On the first day of the Relevant Period, Petrobras issued and Defendant Barbassa signed a Form 6-K that attested to the Company's internal controls over financial reporting, including the statement that:

> Our internal control over financial reporting is a process designed by, or under the supervision of our Audit Committee and our Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with IFRS, as issued by the IASB.
>
> * * *
>
> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

291.    The Company's April 30, 2014 Annual Report for the year 2013, which was also signed by Barbassa, contained Certifications, signed by Defendants Foster and Barbassa, that again purported to attest to the completeness and accuracy of the financial statements contained in the 2013 Form 20-F, and to its compliance with Generally Accepted Accounting Principles (GAAP). The Annual Report was also explicit in mentioning that there was no evidence of bribery at Petrobras, stating "On March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

292.    On September 8, 2014, the Company published a release, filed with the SEC on Form 6-K signed by Defendant Barbassa, that purported to provide a "clarification" on the non-

official information obtained from Paulo Roberto Costa's alleged testimony to the federal police. Barbassa acted with scienter in issuing this statement to cover up the fraud and allow it to continue.  The release stated in relevant part:

> Furthermore, Petrobras fully complies with its obligations and has been providing all information requested by the Federal Police – PF, Federal Audit Court – TCU, Office of the Federal Controller General – CGU and the Public Prosecutor's Office – MP.  In addition, the company always notifies these entities of new facts and information that come to its attention.

[Emphasis added].

293.    The above statements show that Defendant Barbassa was intimately involved in the operations of the Company and, in particular, assuaging the market that the Company was compliant with any and all anti-corruption measures necessary to gain the market's trust. However, the statements made by Barbassa were materially false and misleading when made, as the corruption and bribery at Petrobras had been going on for the entire decade that Barbassa had served as CFO and as a member of the Executive Directorate.

## ADDITIONAL DEVELOPMENTS CONFIRM THE FRAUD

294.    After Partial Revelation I, new reports confirmed and circulated the key allegations made in the TCU report and by CADE. For instance, on October 19, 2014, the *Dow Jones* news service reported that Brazil's President, Dilma Rousseff, the former Chief Executive Officer of Petrobras, admitted that wrongdoing existed within the Company.   *Dow Jones* reported the following:

> HEADLINE: *__Brazil's Rousseff Admits There Was Wrongdoing At__ Petrobras*
>
> *Brazil's President __Recognizes Alleged Embezzlement For The First Time__*
>
> *Brazil's Rousseff Admits Wrongdoing at Petrobras*
>
> BRASILIA--Brazil's President Dilma *Rousseff said Saturday that there was embezzlement at government-controlled oil producer Petróleo Brasileiro SA.*

The company, known as Petrobras, has been at the center of a corruption scandal allegedly involving people connected to Mr. Rousseff's Workers Party, or PT.

*"I will do all I can to reimburse the country," Ms. Rousseff said* during a news conference at the presidential residence late in the afternoon. *"There was" deviation of public money, she said according to a transcript of the interview published on her official campaign website*.

A Petrobras spokesperson didn't immediately respond to a request for comment.

According to local media reports, *top executives at the company have for years taken bribes to direct multimillion contracts to specific contractors*. Part of the alleged *kickbacks were allegedly siphoned to politicians of the PT and other parties that support the government*.

Petrobras has said it is cooperating with authorities in the investigations. *Ms. Rousseff and the PT have repeatedly said that the accusations against Petrobras are baseless and that her administration never condoned corruption.*

[Emphasis added].

295.   This information, however, did not impact the price of Petrobras stock because the core of this information is merely confirmatory of Partial Disclosure I that caused Petrobras stock to decline materially, as discussed in ¶¶166-170 above.  Indeed, each of the additional developments confirming the fraud discussed in this subsection did not impact the price of Petrobras ADS during the Relevant Period because the information was confirmatory in nature of one or more of the Partial Revelations (I-IV) that disclosed new, material information to the marketplace, resulting in a drop on high volume in each instance thereafter.

296.   On October 30, 2014, it was reported that Petrobras' decision to take the actions outlined above and to hire the independent consultants came only after the Company's auditors, PricewaterhouseCoopers, had refused to sign off on quarterly results for 3Q:14 and after PWC

informed Defendants at the Company's October 31, 2014 Board meeting that <u>it</u> would have to alert U.S. authorities if Petrobras did not take the appropriate action.[9]

297.    On November 3, 2014, Petrobras issued a release that reported that José Sergio de Oliveira Machado, the CEO of Transpetro, presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days. Transpetro's Board of Directors approved the request and granted this leave.

298.    The same day, November 3, 2014, *Bloomberg* reported that it was PWC that demanded the Company remove Sergio Machado as the head of transport unit Transpetro. According to *Bloomberg*, PWC refused to sign off on quarterly financial results on which his signature appeared. Also according to *Bloomberg*, several board members initially refused to remove Machado out of concern the action would negatively impact recently re-elected President Dilma Rousseff's governmental coalition.

299.    On November 10, 2014, *Dow Jones* reported that the U.S. Department of Justice had opened a criminal investigation into Petrobras, citing people familiar with the matter. According to the report, the SEC had also begun conducting a civil investigation into the Company. Both investigations involve possible violations of the Foreign Corrupt Practices Act.

300.    Defendants' strategy of portraying Petrobras as the victim of phantom, rogue employees drew the attention of the financial press. As evidence of this, on November 12, 2014, *Dow Jones* reported that while Petrobras was attempting to portray itself as the victim of colluding contractors who gouged the Company and paid bribes to crooked executives and

---

[9] Section 10A of the Securities Act of 1934 requires that the auditor of a company with U.S.-traded shares report illegal acts to the issuer's board of directors. The company must then notify the U.S. Securities and Exchange Commission that it received such a report. If the company fails to notify the SEC, the auditor must send the report itself, according to the regulations.

politicians, experts say that argument could be a "tough sell" with U.S. authorities investigating possible violations of the Foreign Corrupt Practices Act. Specifically, U.S. authorities are unlikely to conclude that Petrobras has no direct liability because it was their employees who were corrupted, and because it was the contractors, not the Company that made illicit payments.

301.    Thus, while it was reported that Petrobras agreed with the characterization that it was victimized, the Justice Department's guidelines for prosecuting business organizations states that "a corporation can only act through" individuals, and can be held responsible for misconduct by employees. Accordingly, experts have concluded that Costa's confession that he received bribes from firms in an alleged cartel and that he knew about the payments to politicians, could open Petrobras to prosecution by U.S. enforcement agencies. As evidence of this, *Dow Jones* further reported, in part, the following:

> "*The vast majority of FCPA enforcement actions are indeed based upon indirect payments*," says Mike Koehler, a law professor at Southern Illinois University. "If Petrobras paid an inflated amount to a contractor, the questions will be why, were they aware it was inflated, and what steps did they take to remedy the situation, or did they just accept the inflated amount with an inkling or suspicion that it would go somewhere else?"

> [Federal Prosecutor, Carlos Lima] said *executives in charge of other divisions were involved in schemes similar to that described by Mr. Costa*.

> \* \* \*

> "That's what makes this so interesting, because typically the U.S. will not investigate the company that has received the bribes," Mr. Fox said. "To open up an investigation, *they're sending a signal that maybe there's something there that we don't even know about yet*."

[Emphasis added].

302.    On November 11, 2014, *Agence France Presse* reported that Petrobras overpaid up to $1.2 billion in kickback transactions, according to Brazil's national accounting office. "We have demonstrated that there was overbilling (at the) Pasadena (refinery). And we found

evidence this happened with other major projects, all of which were worth a total of almost 1.2 billion dollars," said Augusto Nardes, head of the government's accounting arm, known as the TCU. According to Mr. Nardes, the Pasadena refinery alone resulted in a $317 million loss.

303.    On November 13, 2014, the Company announced that it was unable to file its financial statements for 3Q:14, the period ended September 30, 2014, accompanied by a "review report" of its Independent Auditors. Again, without admitting any complicity in the massive fraud, the Company's release stated in part, the following:

> As has become known publicly, Petrobras is undergoing a unique moment in its history, in light of the accusations and investigations of the "*Lava Jato* Operation" being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime against the company's former Downstream Director, Paulo Roberto Costa. The former director is currently under investigation for corruption and embezzlement, among other offenses.
>
> Faced with these circumstances, and considering the declarations of the former Downstream Director in a federal court on October 8, 2014 that, *if found to be true, could potentially affect the company's financial statements*, Petrobras has taken numerous steps aimed at furthering related investigations.
>
> * * *
>
> However, as a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any adjustments to the financial statements based on the accusations and investigations related to the "*Lava Jato* Operation" and (iii) evaluate the need for internal controls improvements, *Petrobras is unable to release its third quarter 2014 financial statements at this time*.
>
> As a result, and in recognition of the importance of transparency, *Petrobras expects to release its third quarter 2014 financial statements, without a review by its Independent Auditors, on December 12, 2014*, reflecting its balance sheet based on facts that are known as of that date.

[Emphasis added].

304.    At that time, Petrobras said that its access to capital markets was and foreseeably would continue to be restricted because the Company delayed its audited third-quarter earnings

report until December amid the corruption probe. The Company stated that it expected to regain its access to capital markets only once it posted its audited earnings report.

305.   Nevertheless, Petrobras's ADSs continued to trade at artificially inflated levels due to the materially false statements and omissions made by the Company during the Relevant Period which had not been corrected. Plaintiff and other investors were unaware of key facts regarding the extent of the bribery and corruption at the Company, and the financial impact that the corruption would have on the Company's future prospects. Over the next month, investors would continue to learn adverse information about the company that removed the inflation in Petrobras ADRs as the truth was revealed, correcting materially false statements and omissions made by Defendants during the Class Period.

306.   The day after Partial Revelation III, November 18, 2014, *Agence France Presse* reported that at least five people accused of corruption in connection with Petrobras had agreed to return $165 million – including Costa who had pledged to return $27 million. Former Petrobras director Pedro Barusco reportedly agreed to pay back $100 million. According to *Agence France*, as much as four billion dollars were allegedly paid to members of the ruling Workers Party and other politicians between 2004 and 2012, to buy influence with cash skimmed off inflated Petrobras contracts.

307.   On November 18, 2014, *Dow Jones* reported that Brazilian federal police had obtained a confession from one of several executives recently arrested on suspected involvement in the massive corruption investigation around Petrobras. According to this report, Erton Medeiros Fonseca, Director of Engineering and Infrastructure at Galvão Engenharia SA, told police that he paid roughly $1.5 million in bribes in order to win contracts from Petrobras.

Fonseca told police that he was extorted by Costa and a late congressman, José Janene, of the Progressive Party.

308.     On November 19, 2014, *Agence France Presse* reported that Brazil's finance ministry had uncovered more than $9.0 billion in suspicious transactions involving Petrobras. According to this report, the finance ministry audit had identified suspicious deposits and withdrawals totaling $9.164 billion between 2011 and 2014, involving thousands of people and companies who did business with Petrobras over that period. According to the ministry auditor, COAF, cash transactions alone totaled $350.6 million. Investigators believe as much as $4.0 billion was allegedly paid to members of the ruling Workers Party and other politicians between 2004 and 2012 to buy influence.

309.     On November 20, 2014, *Folha de S.Paulo* reported that the Brazilian Prosecutors Office in the Federal District and the Public Prosecutor at the Federal Audit Court had called for the immediate dismissal of Defendant Foster as CEO of the Company, and to establish a criminal inquiry into this matter. The request stated that Defendant Foster did not testify truthfully before congress on June 11, 2014, at the Comissao Parlamentar de Inquerito. Specifically, the request stated that Defendant Foster lied when she stated that Petrobras did not receive any warning from Netherland's authorities concerning bribery payments by SBM Offshore to Petrobras.

310.     On November 24, 2014, Petrobras announced that it had received subpoenas from the U.S. Securities and Exchange Commission. According to the Company, the SEC sent Petrobras a subpoena on November 21.

311.     On December 3, 2014, Petrobras CEO, Defendant Barbassa, agreed to pay a fine of $98,000 for stifling the influence of the Company's minority shareholders. According to a *Reuters* report published that day, securities watchdog CVM stated that, by letting state

development bank BNDES and state-led pension funds vote on supposedly independent board members, Petrobras CFO, Barbassa, hindered private shareholders' right to representation. CVM also stated that BNDES and its subsidiary BNDESPAR each agreed to pay a penalty of 500,000 reais and that Petros, the pension fund for Petrobras workers, also faces a fine of 400,000 reais. The CVM also noted that it warned two other pension funds for their similar conduct. *Reuters* stated that this ruling "underscored concerns about corporate governance at Petrobras."

312.   On December 9, 2014, the Company reported that it has been served with a class action complaint filed the prior day by Peter Kaltman in the United States District Court, Southern District of New York, complaining of securities fraud. According to the Company, the Plaintiff in that action confirmed that he is a holder of ADSs of Petrobras and purports to represent a class consisting of all purchasers of ADS on the New York Stock Exchange between May 20, 2010 and November 21, 2014, who were allegedly harmed by the share price drop in connection with the recent accusations of corruption. According to the plaintiff, Petrobras made misleading statements to the market. Based on these allegations, Plaintiff seeks unspecified monetary damages. That day, Petrobras ADSs closed trading at $8.15.

313.   On December 10, 2014, *Folha de S. Paulo* (Brazil) reported that construction giant Camargo Corrêa announced its intention to cooperate and confess its involvement in the Petrobras bribery scandal, in exchange for leniency. According to this report, to avoid losing government contracts, the building contractor Camargo Corrêa would cooperate and confess the crimes investigated in the *Lava Jato* investigation. Notably, three out of eleven executives imprisoned since November 14 by federal police worked for Camargo Corrêa: Council President João Auler, the company's President Dalton Avancini and the Financial Vice President, Eduardo

Leite. Other contractors had already agreed to make a collective deal, and agreed to pay a fine of $386 million.

314.    After Partial Revelation IV, on December 16, 2014, Petrobras ADSs traded to a low of $6.01 as *Bloomberg* reported that the Company was being forced to curb its refining and exploration spending in response to Petrobras' inability to sell debt or equity during the time when it could not produce reliable financial results, and during the time that the Board could not agree on the size of write-downs stemming from graft-related costs. According to this report, Petrobras was being forced to freeze investments in the Premium I and Premium II refineries in northeastern Brazil and sell assets to protect its cash position. *Bloomberg* further reported that Petrobras, the most indebted publicly-traded oil company, was then trading at its lowest level since 2004.

315.    On December 30, 2014, *TheStreet.com* reported that the growing corruption scandal at Petrobras may implicate the Company's employee pension fund. According to this report, Petros, the $24 billion employee-pension fund of Petrobras was singled out by an internal investigation, after the law firms conducting the internal investigation "found possible links to the facts that have been investigated" which entangled the pension fund.

316.    On January 6, 2014, Petrobras ADSs traded to a low of $5.79 before closing the day at $6.02, after Petrobras announced that the Board of Directors of Transpetro, at a meeting held on January 5, 2015, approved to extend the request for unpaid leave made by the CEO of Transpetro, José Sergio de Oliveira Machado, to January 21, 2015.

317.    On January 14, 2015, Petrobras ADSs continued to trade at significantly depressed levels as the *Wall Street Journal* reported, that Brazil's federal police arrested a third former executive of Petrobras in connection with the *Lava Jato* investigation. According to

*TheStreet.com*, police arrested Nestor Cerveró, a former Director of Petrobras' International Division, and the <u>third</u> former Petrobras executive arrested under Operation Car Wash.

318.    The Company has confirmed that the fraud was as widespread as alleged by the testimony of the conspirators. Petrobras revealed the size and scope of its corrupt practices in its January 27, 2015 earnings release, filed with the SEC on Form 6-K on January 28, 2015. Under a heading entitled "Reasons to correct the carrying amount of specified property, plant and equipment," the Company admitted that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people." Specifically, the Company's earnings release disclosed that a whopping ***R$188.4 billion (US$73 billion)*** "or approximately 1/3 of the company's total fixed assets," concerned "contracts signed between Petrobras and the [Cartel] companies . . . from 2004 to April 2012."

319.    This illegal coordination among Cartel members removed all competition from Petrobras bids, causing bids to skyrocket.

320.    The earnings release also explained that the Company concealed the inflated contract amounts by improperly recording them as assets in the cost of PP&E:

> The payments related to the misconduct previously mentioned were recognized as part of the cost of certain property, plant and equipment and, as of September 30, 2014, most of those assets were under construction or were recently completed, and therefore, had little accumulated depreciation.
>
> No impairment losses have been recognized in the past for the property, plant and equipment affected by the payments related to misconduct because their recoverability is tested for impairment in cash-generating units (CGU), whose value-in-use has been historically higher than their carrying amounts. The recoverable amount calculated under the value-in-use approach includes the benefits of existing synergies between the assets that comprise the CGU.

> *Therefore, under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized.*

[Emphasis added].

321.    Petrobras also admitted the need to "correct" the value of its PP&E, and a failure to do so rendered the financial statements materially erroneous and non-compliant with IFRS:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position

> in light of facts known to management and based on documentation available as of the current date, *except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of issue of these financial statements, as set out in note 3.*

> These consolidated interim financial statements have been prepared in accordance with IAS 34 - Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), *except for the errors mentioned above and further discussed in note 3.*

[Emphasis added].

322.    At the time, in January 2015, Petrobras did not record an asset writedown in connection with its wrongdoing, though the Company acknowledged that an internal review indicated that writedowns would potentially range between $1.5 billion and $34 billion.

323.    Petrobras admitted in its 20-F for Fiscal 2014, according to footnote number 3, Petrobras, rather than performing any prior period adjustment, instead represented that it would be impracticable to determine the specific assets and the specific periods affected by the illicit overpayments, bribes, and kickbacks.  Instead, the write-off was made exclusively in fiscal 2014, with no restatement of any prior period.  The total impact on the financial statements was $2.527 billion.  The impact on the balance sheet is detailed at footnote 12.1 in the 20-F.  The write down was allocated across several different asset groups in PP&E.  Approximately $35 million was

written off "Land, buildings, and improvement." Approximately $1.6 billion was written off "Equipment and other assets." Further, approximately $1.078 billion was written off "Assets under construction." Capitalized "Exploration and development costs" (Oil and gas producing properties)" were written down by $91 million. The impact on the income statement is detailed at footnote 26, costs and expenses by nature. The Company took a one-time write off of $2.527 billion. The write-off had a dollar for dollar adverse impact on net income. The reduction in net income would in turn reduce shareholders' equity.

324. In the wake of the scandal, several Petrobras executive have left the Company, and many participants [list them] in the kick-back scheme have pled guilty to bribery and corruption charges. On February 4, 2015, Defendant Foster, Defendant Barbassa and four other executives left the Company, which, according to an article in *Reuters*, indicated efforts "to limit the political fallout from a writedown rather than clean out dead-wood in the company's accounts." Costa and Barusco both admitted to the scheme and agreed to return millions of dollars in bribes they received in connection with the bribes. Barusco corroborated Costa's statements in his sworn testimony offered in connection with his plea bargain. Barusco estimated that the Workers Party received as much as $200 million through Petrobras contracts.

325. In addition, according to an article in *Valor International* in February 2015, numerous Petrobras employees and executives worked to ensure Cartel bids were accepted by Petrobras. The article details how Petrobras personnel would hold meetings with Cartel members at Company offices in Rio de Janeiro, and the minutes to those meetings describe how, Petrobras employees "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal" by the Company.

326.    People outside the Company have also admitted to wrongdoing and corroborated Costa and Barusco's account of the scheme. For example, Youssef, a convicted black market money launderer, admitted to personally delivering cash payments to Petrobras executives and politicians in Brazil. Augusto Ribeiro de Mendonça Neto ("Mendonça Neto") , a director of Toyo Setal, an EPC contractor in Brazil and member of the Cartel, also provided information regarding the scheme. Julio Camargo, another Toyo-Setal executive, testified that he paid R$12 million (approximately US$5.1 million) in bribes to Costa and Duque to build a major component at the Repar refinery. Erton Medeiros Fonseca, the CEO of Galvão Engenharia, a leading Brazilian construction company, provided Brazilian prosecutors with receipts of bribes paid to Duque.

327.    According to Erton Medeiros Fonseca, Galvão consistently outbid its competitors on projects, but it wasn't until Galvão began paying bribes to Petrobras that Galvão won any contracts. Erton Medeiros Fonseca, through his attorney, stated that "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by [José] Janene," a money launderer who facilitated bribes to Petrobras executives. Janene told Erton Medeiros Fonseca at a meeting at Fonseca's home in 2010 "in a very truculent way . . . that *to be able to win contracts, he would have to pay*." The contracts Galvão won with bribery money included projects as large as R$2 billion to R$3 billion (approx. US$1.1 billion to US$1.7 billion), such as construction contracts at Abreu.

328.    On February 24, 2015, Moody's Investors Services downgraded all ratings of Petrobras and assigned a Ba2 Rating, or junk status, to the Company. That status placed Petrobras two levels below investment grade and Moody's warned that further reductions were possible.

329.    On February 20, 2015, the Brazilian prosecutors filed charges against six Brazilian construction companies for paying bribes to Petrobras and taking money from public coffers through the bribery scheme.

330.    Federal Police arrested Renato Duque on March 16, 2015, for the second time in connection with the investigation into Petrobras and formally charged him with the crime of money laundering. The next day, on March 17, 2015, Brazilian prosecutors formally charged Joao Vaccari Neto, the treasurer of the ruling Workers' Party (PT), with corruption and bribery.

331.    Shortly thereafter, on March 18, 2015, Switzerland froze $400 million in assets linked to the Petrobras scandal.

332.    On or around April 22, 2015, Petrobras' 2014 financials were approved 7-2 by the 10 person Board of Directors at a meeting.  All seven votes in favor of approving the financials came from Directors appointed by the government, while the two votes against approving the financials, and the single abstention, came from the three independent directors.  Petrobras has attempted to portray the release of the financials as a turning point for the Company, with new President and CEO Aldemir Bendine describing the publication of the financials on April 23, 2015  as "From this moment, Petrobras turns over a new page." However, the testimony and statements of the independent Board members tell a different story.

a.  Jose Guimaraes Monforte, an independent director who was elected to represent shareholders of non-voting-shares, stated that he abstained from voting because he was given less than two hours to review 319 pages of documents relating to $16.8 billion in write-downs and impairments. He is quoted in an April 28, 2015 *Wall Street Journal* article as describing the vote as "[falling] short of what full due diligence would require on my part,

especially given the need for recovering the company's credibility." Monforte resigned unexpectedly after the financial statements were issued.

b. Another independent Board member, Mauro Rodrigues da Cunha, who was elected to represent minority shareholders of voting shares, criticized the lack of time that he and other Board members had been given to review the documents and also criticized the methodology of the calculations of the asset impairment, saying that the impairment did not fully reduce the overvaluation of refineries on Petrobras' books. In testimony before the CPI, given on April 29, 2015, Cunha stated that the values used in calculating the 2014 impairments "were calculated on the basis of the testimony of former director Paulo Roberto Costa who said that the bribes represented 3% of the contacts' values. We are running the risk of using values that are lower than the losses."

c. Cunha also objected to the secrecy of the Company, stating that Petrobras withheld documents from the Board under the guise of confidentiality, even though those documents had been turned over to the SEC. Earlier in 2015, Cunha decided not to run for re-election due to frustration with the government's role in the company.

d. The third independent director, Silvio Sinedino, who was elected to represent the interests of Petrobras workers, voted against approving the financials because he "did not agree with the methodology presented in two ways: the first phase of production from the Aberu e Lima refinery was not entered into the asset impairment calculation, and instead was recorded in the cash-generating units; and also, he disagreed with the responsibility assumed by

Petrobras as a sponsor of Petros." Mr. Sinedino was voted out of his position in early 2015 and was replaced on the Petrobras Board on April 29, 2015.

333.    As of the filing of this Complaint, at least twenty large construction firms have now been implicated in this scheme. At least 85 warrants have been issued and several companies have already agreed to cooperate and to surrender hundreds of millions of dollars to the Brazilian authorities in penalties and fines. As of March 11, 2015, at least four former Petrobras executives and at least 23 construction executives have been charged with crimes such as corruption and money laundering.

334.    As of May 15, 2015, the Brazilian Supreme Court has authorized the investigation of 48 current and former legislators and on May 14, 2015, Brazilian prosecutors charged four former members of congress with money laundering, embezzlement and other crimes on Federal prosecutor Deltan Dellagnol said more public officials will be charged.

335.    Although the above  additional confirming information did not reveal new material information to the marketplace, it further confirms the falsity of Defendants' statements and omissions during the Relevant Time, further demonstrates Defendants' scheme liability, and provides substantial evidence to bolster Plaintiff's scienter allegations against each of the Individual Defendants as well as Petrobras itself.

## ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' ACTIONABLE STATEMENTS AND OMISSIONS OF OPINION

336.    Defendants' opinion statements omitted material facts about Defendants' inquiry into or knowledge concerning their statements of opinion. The omitted facts show the statements made by Defendants lacked the basis for making those statements that a reasonable investor would expect, even if Defendants subjectively held that opinion, which they did not. A reasonable investor in Petrobras expects not just that Defendants believe the opinions publicly

125

stated (however irrationally), but that they fairly align with the information in Defendants'
possession at the time.

337.    Plaintiff's expectations about the degree of certainty underlying an opinion is the
function of the specificity of the opinion itself and the speaker's special knowledge that is
unavailable to Plaintiff. For statement of opinion, the proper analysis is what a reasonable person
would naturally understand a statement to convey beyond its literal meaning. For opinion
statements, this means considering the foundation investors would expect an issuer to have
before making the statement. Where, as here, Defendants omitted material facts about their
inquiry into or knowledge concerning their statements of opinion, and those facts conflict with
what a reasonable investor would take from the statements themselves, the omissions create
liability. Defendants knew at the time they made these statements of opinion particular facts the
omission of which made the opinions at issue misleading to a reasonable person reading the
statement fairly and in context.

338.    Defendants' choice of accounting treatments are statements of opinion.
Defendants' accounting treatments include its capitalization of costs and its reporting of PP&E,
assets, and net income. Those opinions imply that Defendants had a basis in fact to utilize the
particular treatment and that Defendants were not in possession of facts that rebutted the opinion.

339.    In truth, Defendants had no reasonable basis for these opinions and possessed
facts that rebutted them, including but not limited to: Petrobras, its CEO, CFO, and the entire
Executive Directorate knew Petrobras' construction contract values were materially overstated
prior to and throughout the Relevant Period as a result of the bribery and bid-rigging scheme
detailed herein which resulted in systemic artificial inflation in contract prices and bribes built
into virtually every contract with the Cartel companies; Defendants knew or recklessly

disregarded that the Company's capitalization of these costs caused its financial statements, including its reporting of PP&E, assets and net income, to be materially overstated throughout the Relevant Period. Defendants' knowledge and the fact that they had no reasonable basis for their opinions is demonstrated by, *inter alia*, the indictments and plea agreements and testimony of Costa and Barusco detailing involvement of virtually all members of the Directorate in a massive scheme prior to and throughout the Relevant Time Period; the indictments of three other members of the Directorate, including former CEO Gabrielli; the removal by Defendants of the Company's critics from positions of power, including various whistleblowers, such as Fonseca, who was personally threatened for reporting to Defendant Foster and others that she had found substantial evidence of a fraudulent scheme.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

340.    At all relevant times, the market for Petrobras' ADSs was an efficient market for the following reasons, among others:

- Petrobras' ADSs met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

- As a regulated issuer, Petrobras filed periodic public reports with the SEC and the NYSE;

- Petrobras regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other reporting services; and

127

• Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

341.    As a result of the foregoing, the market for Petrobras securities promptly digested current information regarding Petrobras from all publicly available sources and reflected such information in Petrobras ADS prices. Under these circumstances, Plaintiff who purchased Petrobras' ADSs during the Relevant Period do so at artificially inflated prices and has now suffered a material injury and a presumption of reliance applies.

## NO SAFE HARBOR

342.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

343.     Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by Petrobras, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **FIRST CLAIM**

### **Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants Petrobras, Foster, and Barbassa.**

344.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

345.     During the Relevant Period, Petrobras, Foster, and Barbassa participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

346.     Petrobras, Foster, and Barbassa violated § 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

347.     Petrobras, Foster, and Barbassa, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Petrobras as specified herein.

348.     Petrobras, Foster, and Barbassa, had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Petrobras's true financial condition from the investing public and supporting the artificially inflated price of Petrobras's ADSs.

349.     Plaintiff, in reliance on the integrity of the market, paid artificially inflated prices for Petrobras ADSs and was harmed when the truth was revealed, removing the artificial inflation from the price of the ADSs. Plaintiff, through its Assignors, would not have purchased Petrobras ADSs at the prices it paid, or at all, had it been aware that the market prices for Petrobras ADSs had been artificially inflated by Defendants' fraud.

**SECOND CLAIM**

**Violations Of § 10(b) Of The Exchange Act And
Rule 10b-5(a) & (c) Against All Defendants**

350.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

351.     During the Relevant Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive Plaintiff regarding Petrobras' asset value and book value, its business and operations, management credibility and the intrinsic value of Petrobras ADSs; (ii) enable Defendants to artificially inflate the price of Petrobras securities; (iii) enable Petrobras to sell at least $8.5 billion of corporate debt securities while in possession of material adverse non-public information about the Company during the Relevant Period; (iv) cause Plaintiff, through its Assignors,  to purchase Petrobras ADSs at artificially inflated prices; and (v) harm Plaintiff when the truth was revealed causing the artificial inflation to be removed from the price of the ADSs. In furtherance of this

unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

352.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff who purchased the Company's ADSs in an effort to maintain artificially high market prices for Petrobras' ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

353.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Petrobras as specified herein.

354.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Petrobras' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Petrobras and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiff, through its Assignors,  as the purchaser of Petrobras ADSs during the Relevant Period.

355.    All of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i)  Individual Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) Individual Defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Individual Defendants were aware of the Company's dissemination of information to Plaintiff and the investing public which they knew or recklessly disregarded was materially false and misleading.

356.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing Petrobras' multi-billion dollar bribery and bid-rigging scheme from investors, and supporting the artificially inflated price of its ADSs. As demonstrated by Defendants' overstatements and misstatements of the Company's asset values and book value, as well as its business and operations, and earnings throughout the Relevant Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

357.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Petrobras ADSs were artificially inflated during the Relevant Period. In ignorance of the fact that market prices of Petrobras' publicly-traded ADSs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Relevant Period, Plaintiff acquired Petrobras ADSs during the Relevant Period at artificially high prices and were damaged thereby.

358.    At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known the truth regarding the fraud, bribery and bid-rigging that was ongoing at Petrobras, which were not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired its Petrobras ADSs, or, if it had acquired such ADSs during the Relevant Period, it would not have done so at the artificially inflated prices which it paid.

359.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

360.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Petrobras ADS during the Relevant Period.

## THIRD CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against Individual Defendants

361.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

362. The Individual Defendants acted as controlling persons of Petrobras within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

363. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

364. As set forth above, Petrobras and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's ADSs during the Relevant Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that Plaintiff has an effective remedy; and

C.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 24, 2015

 /s/ Kim E. Miller
KIM E. MILLER (KM-6996)
BRUCE W. DONA (BD-3730)
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, Ste. 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com


LEWIS S. KAHN
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

**Attorneys for Plaintiff**

# EXHIBIT A

**Account 1:**

| Date | Shares | Price | Cost |
|---|---|---|---|
| 8/8/2014 | 2,000,000 | $15.82 | $31,631,018.00 |
| 8/13/2014 | 1,000,000 | $15.75 | $15,748,664.00 |
| 9/2/2014 | 612,200 | $20.05 | $12,277,208.79 |
| 9/3/2014 | 387,800 | $20.73 | $8,039,500.41 |
| 9/8/2014 | 1,000,000 | $18.35 | $18,345,424.00 |
| 9/18/2014 | 300,000 | $17.05 | $5,114,144.10 |
| 9/22/2014 | 1,000,000 | $15.77 | $15,772,140.00 |
| 9/29/2014 | 1,000,000 | $14.67 | $14,673,242.00 |
| 10/6/2014 | 1,000,000 | $15.88 | $15,878,395.00 |
| 10/9/2014 | 1,000,000 | $16.84 | $16,844,995.00 |
| 10/21/2014 | 1,700,000 | $13.17 | $22,381,409.50 |
| 10/23/2014 | 300,000 | $12.59 | $3,777,151.20 |
| 10/24/2014 | 277,195 | $12.74 | $3,530,342.21 |
| 10/27/2014 | 1,722,805 | $11.06 | $19,058,046.20 |
| 11/3/2014 | 1,600,000 | $11.28 | $18,049,425.60 |
| 11/6/2014 | 400,000 | $10.70 | $4,278,888.40 |
| 11/13/2014 | 500,000 | $10.49 | $5,245,000.00 |
| 11/18/2014 | 550,000 | $9.41 | $5,177,295.75 |
| 11/20/2014 | 950,000 | $9.75 | $9,258,659.15 |
| 11/24/2014 | 1,000,000 | $10.75 | $10,752,355.00 |
| 12/2/2014 | 2,000,000 | $8.99 | $17,972,538.00 |

**Account 2:**

| Date | Shares | Price | Cost |
|---|---|---|---|
| 3/21/2014 | 500,000 | $11.57 | $5,783,350.00 |
| 3/21/2014 | 500,000 | $11.69 | $5,845,750.00 |
| 3/24/2014 | 1,000,000 | $11.70 | $11,697,400.00 |
| 3/24/2014 | 1,000,000 | $11.98 | $11,976,100.00 |
| 3/25/2014 | 652,900 | $12.19 | $7,956,827.01 |
| 3/27/2014 | 347,100 | $12.86 | $4,463,046.51 |
| 4/8/2014 | 1,000,000 | $13.89 | $13,885,762.00 |
| 4/9/2014 | 1,000,000 | $13.63 | $13,629,622.00 |

**Account 3:**

| Date | Shares | Price (MXN$) | Cost (MXN$) |
|---|---|---|---|
| 8/13/2014 | 1,000,000 | $206.00 | $206,000,000.000000 |
| 8/13/2014 | 1,000,000 | $208.00 | $208,000,000.000000 |
| 9/3/2014 | 35,000 | $264.70 | $9,264,500.000000 |
| 9/3/2014 | 165,000 | $265.00 | $43,725,000.000000 |
| 9/3/2014 | 40,000 | $264.70 | $10,588,000.000000 |
| 9/3/2014 | 110,000 | $265.00 | $29,150,000.000000 |
| 9/4/2014 | 20,000 | $257.95 | $5,159,000.000000 |
| 9/4/2014 | 20,000 | $258.14 | $5,162,800.000000 |
| 9/4/2014 | 20,000 | $258.25 | $5,165,000.000000 |
| 9/4/2014 | 20,000 | $258.50 | $5,170,000.000000 |
| 9/4/2014 | 20,000 | $258.60 | $5,172,000.000000 |
| 9/4/2014 | 20,000 | $258.70 | $5,174,000.000000 |
| 9/4/2014 | 20,000 | $259.00 | $5,180,000.000000 |
| 9/4/2014 | 20,000 | $259.30 | $5,186,000.000000 |
| 9/4/2014 | 10,000 | $260.66 | $2,606,600.000000 |
| 9/4/2014 | 10,000 | $260.70 | $2,607,000.000000 |
| 9/4/2014 | 5,000 | $260.80 | $1,304,000.000000 |
| 9/4/2014 | 10,000 | $260.88 | $2,608,800.000000 |
| 9/4/2014 | 10,000 | $260.90 | $2,609,000.000000 |
| 9/4/2014 | 30,000 | $260.95 | $7,828,500.000000 |
| 9/4/2014 | 50,000 | $261.30 | $13,065,000.000000 |
| 9/4/2014 | 30,000 | $261.60 | $7,848,000.000000 |
| 9/4/2014 | 30,000 | $261.83 | $7,854,900.000000 |
| 9/4/2014 | 80,000 | $262.00 | $20,960,000.000000 |
| 9/4/2014 | 10,000 | $262.10 | $2,621,000.000000 |
| 9/4/2014 | 30,000 | $262.19 | $7,865,700.000000 |
| 9/4/2014 | 30,000 | $262.20 | $7,866,000.000000 |
| 9/4/2014 | 50,000 | $262.27 | $13,113,500.000000 |
| 9/4/2014 | 50,000 | $262.30 | $13,115,000.000000 |
| 9/4/2014 | 30,000 | $262.45 | $7,873,500.000000 |
| 9/4/2014 | 125,000 | $262.50 | $32,812,500.000000 |
| 9/4/2014 | 110,000 | $262.59 | $28,884,900.000000 |
| 9/4/2014 | 30,000 | $262.75 | $7,882,500.000000 |
| 9/4/2014 | 50,000 | $262.90 | $13,145,000.000000 |
| 9/4/2014 | 30,000 | $262.95 | $7,888,500.000000 |
| 9/4/2014 | 30,000 | $263.00 | $7,890,000.000000 |
| 9/8/2014 | 30,000 | $249.19 | $7,475,700.000000 |
| 9/8/2014 | 30,000 | $249.10 | $7,473,000.000000 |
| 9/8/2014 | 30,000 | $249.89 | $7,496,700.000000 |
| 9/8/2014 | 110,000 | $250.00 | $27,500,000.000000 |
| 9/8/2014 | 50,000 | $249.90 | $12,495,000.000000 |
| 9/8/2014 | 50,000 | $249.55 | $12,477,500.000000 |
| 9/8/2014 | 200,000 | $250.00 | $50,000,000.000000 |
| 9/8/2014 | 180,000 | $250.00 | $45,000,000.000000 |

| | | | |
|---|---|---|---|
| 9/8/2014 | 30,000 | $249.80 | $7,494,000.000000 |
| 9/8/2014 | 30,000 | $249.89 | $7,496,700.000000 |
| 9/8/2014 | 60,000 | $249.90 | $14,994,000.000000 |
| 9/8/2014 | 25,000 | $244.30 | $6,107,500.000000 |
| 9/8/2014 | 25,000 | $243.82 | $6,095,500.000000 |
| 9/22/2014 | 20,000 | $209.16 | $4,183,200.000000 |
| 9/22/2014 | 20,000 | $208.95 | $4,179,000.000000 |
| 9/22/2014 | 10,000 | $209.15 | $2,091,500.000000 |
| 9/22/2014 | 10,000 | $209.14 | $2,091,400.000000 |
| 9/22/2014 | 20,000 | $209.17 | $4,183,400.000000 |
| 9/22/2014 | 10,000 | $208.94 | $2,089,400.000000 |
| 9/22/2014 | 3,000 | $212.00 | $636,000.000000 |
| 9/29/2014 | 20,000 | $197.12 | $3,942,400.000000 |
| 9/29/2014 | 30,000 | $197.50 | $5,925,000.000000 |
| 9/29/2014 | 40,000 | $197.45 | $7,898,000.000000 |
| 9/29/2014 | 10,000 | $197.35 | $1,973,500.000000 |
| 9/29/2014 | 10,000 | $197.98 | $1,979,800.000000 |
| 9/29/2014 | 50,000 | $198.00 | $9,900,000.000000 |
| 9/29/2014 | 10,000 | $197.60 | $1,976,000.000000 |
| 9/29/2014 | 10,000 | $199.95 | $1,999,500.000000 |
| 9/29/2014 | 27,000 | $200.00 | $5,400,000.000000 |
| 10/7/2014 | 10,000 | $227.83 | $2,278,300.000000 |
| 10/7/2014 | 65,000 | $227.90 | $14,813,500.000000 |
| 10/7/2014 | 25,000 | $228.00 | $5,700,000.000000 |
| 10/7/2014 | 25,000 | $277.85 | $6,946,250.000000 |
| 10/7/2014 | 75 | $227.90 | $17,092.500000 |
| 10/7/2014 | 49,925 | $227.95 | $11,380,403.750000 |